## JOHN BOWIE *vs.* EVENING NEWS et al.

*Libel—Imputations on Sheriff—Dereliction in Official Duty—*
*Office of Innuendo—Matter Libellous Per Se.*

The presumption that words are defamatory arises much
more readily in cases of libel than in cases of slander.　p. 574

Any unprivileged, false and malicious publication which, by
printing, writing, signs or pictures, tends to expose a person to
public scorn, hatred, contempt or ridicule, constitutes an action-
able libel.　　　　　　　　　　　　　　　　　　　　p. 574

In determining whether an alleged defamatory statement is
to be given that effect, the whole publication is to be considered,
and it is sufficient that the defamatory charge may naturally
be implied and understood according to the common and or-
dinary meaning given to the words in the sense in which they
are used by people generally.　　　　　　　　　　　　p. 574

Since general damages cannot be recovered for a libel ac-
tionable *per quod,* it follows that if no special damages are
charged the publication, if actionable at all, must be actionable
*per se.*　　　　　　　　　　　　　　　　　　　　　p. 575

Words actionable *per se* require no innuendo to make their
defamatory nature apparent, and words which do require such
an innuendo are not actionable *per se.*　　　　　　　p. 575

A newspaper article which, taken as a whole, including the
headlines, in effect stated that a sheriff was rebuked by the
court for some dereliction in the discharge of his official duties
connected in some way with the increase of "bootlegging," which
was a disgrace, and that the court, in its charge to the grand
jury, strongly hinted at corruption in local political circles, and
that the court blamed the sheriff for permitting a witness to
be tampered with, was, assuming that the charge was false and
malicious, and that no such statement was made by the court,
libelous *per se.*　　　　　　　　　　　　　　　pp. 576, 577

The office of an innuendo is to explain the words published
and to give to them their true meaning, but it cannot introduce

new matter, add to or enlarge the sense of those words, or impute to them a meaning not warranted by the publication, when taken alone or read in connection with the inducement and *colloquium.*                                                    p. 579

A newspaper statement merely that the sheriff had been blamed by the court for permitting a witness to be tampered with could not, by an innuendo, be given the meaning that the sheriff lacked honesty in the exercise of his official duties.      p. 579

Where words charged are actionable on their face, that an innuendo seeks improperly to enlarge the meaning of some of the words does not vitiate the declaration, the innuendo being in such case merely surplusage.                                p. 580

*Decided June 11th, 1925.*

Appeal from the Superior Court of Baltimore City (FRANK, J.).

Action by John Bowie against the Evening News, a corporation, and others. From a judgment for defendants, plaintiff appeals. Reversed.

The cause was argued before BOND, C. J., URNER, ADKINS, OFFUTT, PARKE, and WALSH, JJ.

*Eugene P. Childs* and *L. Wethered Barroll*, with whom were *James J. Lindsay* and *John W. Barroll* on the brief, for the appellant.

*George Weems Williams* and *L. Vernon Miller*, with whom were *Marbury, Gosnell & Williams* on the brief, for the appellees.

OFFUTT, J., delivered the opinion of the Court.

On October 20th, 1924, the following article was published in the several editions of the Baltimore News, a newspaper published in the city of Baltimore:

"Special Dispatch to the News., Annapolis, Oct. 20.—Corruption in official circles of Annapolis and

Anne Arundel County was strongly hinted at by Judge
Robert Moss of the circuit court in his charge to the
grand jury this morning. The judge's charge also in-
cluded a stinging rebuke to Sheriff Bowie of the county.
After declaring the increase of bootlegging was a dis-
grace to the county, Judge Moss said a clean up of
conditions was in order. He referred to Garfield Chase
(colored), who was employed as a 'stool pigeon' by the
sheriff's office in running down bootlegs, and said re-
peated attempts to tamper with Chase and make him
useless as a state's witness had been made. He blamed
Sheriff Bowie for permitting these attempts and inti-
mated that a member of the city police force was re-
sponsible for them. The court insisted that Chase be
indicted either for bootlegging or for perjury, and
urged the jury to go to the bottom of the plot to save
those against whom Chase was to testify."

The text of the article was the same in each of the edi-
tions, but the headlines describing it varied; in the "Home
Final" edition the headlines were as follows: "Jurist Hints
at Scandal in Anne Arundel. Scandal in A. A. County is
Scented. Increase of Bootlegging is called Disgrace in
Charge to Jury." In the "Financial" edition they were in
this form: "County Scandal Hinted. Scandal in A. A.
County is Hinted. Increase of Bootlegging is called Dis-
grace in Charge to Jury"; and in the "Peach" and "Night"
editions they were identical and in this form: "Jurist Re-
bukes Anne Arundel Sheriff. Sheriff is rebuked by Judge.
Increase of Bootlegging is Called Disgrace in Charge of
Jury," except that in the "Night" edition, the concluding
lines read "Increase of Bootlegging is Called a Disgrace in
Charge *to* Jury" instead of "Increase of Bootlegging is Called
Disgrace in Charge *of* Jury," as they appeared in the "Peach"
edition.

Following these publications, the appellant, who is the
John Bowie mentioned in the article, brought this action in
the Superior Court of Baltimore City, against the appellees,
and successively filed therein four complete declarations, re-

ferred to as the original, and the first, second and third amended declarations. Demurrers were filed by the defendants and sustained by the court to each of those declarations, and after the demurrer to the third amended declaration had been sustained, a judgment for the defendants for costs was entered, and from that judgment this appeal was taken.

The principal questions which the appeal presents are, first, whether, assuming, as we must upon the demurrer, that Judge Moss never made the statements imputed to him by the article, and assuming that the statements were moreover false and malicious, are they actionable, and second, if they are, does any one of the four counts of the *narr.* properly state a cause of action.

The first question is one of substantive law, the second one of pleading.

Before attempting to analyze the alleged libelous publication, in connection with the first of these questions, we will refer briefly to the legal principles applicable to cases of this character, as they have been stated and applied in this Court. It may be stated generally that the right of the individual citizen to rest secure in the possession of his good name, fame and reputation is a valuable privilege, of which no one may deprive him through falsehood and malice without liability to him for the injury. In theory that principle is practically universally recognized, but its application to the facts of particular cases has often been so forced, unnatural, and confused, that it has become exceedingly difficult to formulate any general rule for its application which will afford the citizen adequate protection in the enjoyment of a privilege, and a right which are concededly his.

Nowhere are the general principles of the law of libel as recognized in this State more clearly or accurately stated than in the case of *Negley v. Farrow,* 60 Md. 158, where the question before the Court was whether the publication of a charge intimating that a state senator had sold his vote for private gain was libelous *per se.* In considering that question the Court said: "It can hardly be necessary to say that

such charges as these, against the official conduct of the plaintiff, and the imputation of the base and sordid motives by which such conduct was governed, were calculated to injure his reputation and expose him to the contempt of all honorable men. Independent altogether of the innuendoes, the article on its face shows that these charges were made against the plaintiff, and we have no hesitation, therefore, in saying that the publication is in itself libellous. * * * No one denies the right of the defendants to discuss and criticise boldly and fearlessly the official conduct of the plaintiff. It is a right, which, in every free country belongs to the citizen, and the exercise of it, within lawful and proper limits, affords some protection at least against official abuse and corruption. But there is a broad distinction between fair and legitimate discussion in regard to the conduct of a public man, and the imputation of corrupt motives, by which that conduct may be supposed to be governed. And if one goes out of his way to asperse the personal character of a public man, and to ascribe to him base and corrupt motives, he must do so at his peril; and must either prove the truth of what he says, or answer in damages to the party injured." In *Shepherd v. Baer*, 96 Md. 152, and in *Kilgour v. Evening Star*, 96 Md. 16, these principles were restated and approved. In the case last cited the plaintiff was the State's Attorney of Montgomery County, and the publication complained of charged that he had ordered the release of a colored woman who was under arrest on some charge growing out of the death of a negro baby, and that "this action of the State's Attorney produced mingled feelings of indignation and resentment on the part of white and colored residents; also what Mr. Thompson had to say about it, to the effect, that 'he denounced it as an outrage on Kilgour's part'; had it been a white man who was charged etc., he would in all probability have been strung up to one of the trees etc., and that he intended 'to leave no stone unturned to sift the whole affair'; and, further that the justice of the peace expressed 'similar views' etc * * *. In the opening sentences of the publication, it is stated that

many prominent citizens were greatly agitated, 'on account of the alleged stifling by the State's Attorney of an investigation of the mysterious death etc.' " To quote from the opinion, there was nothing in that charge which "imputes corrupt motives to the appellant, or that he prevented any inquiry into the death of the child, or that he did anything 'by malfeasance in the discharge of his official duties.' "

In *Weeks v. News Publishing Company*, 117 Md. 130, in connection with an elaborate review of the authorities, that principle was again approved and restated, as it was also in *Goldsborough v. Orem*, 103 Md. 681, and *Stannard v. Gibbs*, 118 Md. 151. While these cases all recognize the principle that no one may by falsely and maliciously defaming him deprive another of his good name without liability, it is nevertheless often difficult to determine just what amounts to actionable defamation. It has been said that there is no definition of the term "libel" sufficiently comprehensive to include all cases, and a very great number of instances in which attempts have been made to define it, collected in note 44a, 36 C. J. 1143, illustrate the force of that comment. There is, however, a distinction between oral and written or printed defamation, and "the presumption that words are defamatory arises much more readily in cases of libel than in cases of slander." *Ibid.* 1152. And the courts seem to be in general accord at least upon this, that any unprivileged, false, and malicious publication which by printing, writing, signs or pictures tends to expose a person to public scorn, hatred, contempt, or ridicule, constitutes an actionable libel. 36 C. J. 1145 etc.

And in determining whether an alleged defamatory statement is to be given that effect the whole publication is to be considered and it is not necessary that the supposed defamatory charge be made directly; it is sufficient if it may naturally be implied and understood according to the common and ordinary meaning given to the words in the sense in which they are used by people generally. *Ibid.* 1154.

Reverting to the question immediately before us, it ap-

pears that no special damages are charged in any one of the four counts of the third amended declaration which, under the case of *Ellinger v. Baltimore City,* 96 Md. 698 *et seq.,* is the only one which we can consider on this appeal. And since general damages cannot be recovered for a libel actionable *per quod* (36 *C. J.* 1150) it follows that if the alleged defamatory publication is actionable at all, it must be actionable *per se. Kilgour v. Evening News Company,* 96 Md. 16; 36 *C. J.* 1151. It has been said that words actionable *per se* require no innuendo to make their defamatory nature apparent, and words which do require such an innuendo are not actionable *per se.* 36 *C. J.* 1151. And while that rule has not been stated in that precise form in this State, nevertheless it was substantively approved in *Prinsfield v. Howeth,* 107 Md. 284, where the court said: "If the declaration is not otherwise good, the innuendoes cannot make it good. They cannot add to or enlarge the sense of the words used, and if the alleged defamatory words do not constitute slander in themselves, the innuendoes cannot enlarge or add to their legal meaning and effect. The innuendo is merely a form, or mode of introducing explanation; it serves to point out some matter already expressed, it may apply what is already expressed, but cannot enlarge the sense of the previous words. The legal effect of the innuendo is a question of law which arises under the demurrer. This Court said, in *Lewis v. The Daily News Company,* 81 Md. 472: 'Upon demurrer it is always the province of the court to determine whether the words charged in the declaration amount in law to libel or slander. *Dorsey v. Whipps,* 8 Gill, 462; *Haines v. Campbell,* 74 Md. 158; *Avirett v. State,* 76 Md. 510. It is equally a matter of law as to whether an innuendo is good; that is to say, whether it is fairly warranted by the language declared on, when that language is read, either by itself, or in connection with the inducement and *colloquium,* if there be an inducement and *colloquium* set forth. *Avirett v. State, supra; Solomon v. Lawson,* 8 Q. B. 823.'"

The question therefore is whether the publication charged in the four counts of the declaration are actionable *per se.* In considering that question it must be remembered that Bowie was the sheriff of Anne Arundel County, and an essential part of the judicial machinery of the State, bound by his oath of office to uphold and support the laws and Constitution of the State, and to diligently faithfully and without partiality or prejudice execute the duties of his office, and that Judge Moss had no right or authority to "rebuke" him except for some dereliction in the discharge of those duties. In the opinion of a majority of the court the natural and plain inference to be drawn from the whole article, including the headlines, is that Bowie was rebuked for some dereliction in the discharge of the duties of his office which was connected in some way with the increase of "bootlegging," which was a "disgrace."

The statement that Bowie was rebuked by the court precedes and follows the statement: "Corruption in the official circles of Annapolis and Anne Arundel County was strongly hinted at by Judge Robert Moss of the circuit court in his charge to the grand jury this morning." It is contended that the use of the word "also" in the second paragraph of the statement shows that neither the judge nor the article connected the sheriff with the corruption hinted at, and, while grammatically and technically that may be so, we think such a construction of the whole article is too refined and savors too much of special pleading, to be applied in a case of this character. The plaintiff was a public official, enjoying his office as a result of public confidence and trust, and when the public were informed in the most striking and conspicuous manner by a powerful and influential journal, widely circulated, that he had been officially rebuked by the very court which his duties required him to serve, and when that statement was followed by the charge that that court had hinted at "corruption" in "official circles of Annapolis and Anne Arundel" of which "circles" he was a part, and by the further charge that the "increase of bootlegging was a disgrace"

to the county, and that the court had blamed him for permitting a State's witness used in such cases to be tampered with, the natural and likely impression which it would convey to the average and ordinary reader would be that the court had rebuked Bowie because his conduct had shown him unfit to perform the duties of his office, and, it was, assuming that the charge was false and malicious, and that no such statement was made by the court, libelous *per se.* The appellees cite the cases of *Kilgour v. Evening Star, supra,* and *Weeks v. Evening News, supra,* as opposed to this conclusion. The *Weeks* case is clearly not in point, because that case finally went off on a question of pleading, but the case of *Kilgour v. Evening Star* is more apposite, and the writer of this opinion finds it difficult to distinguish this case from that. In that case the publication charged that an act of the State's attorney, performed under color of the authority of his office, had produced mingled feelings of indignation and resentment on the part of white and colored persons, that one of them had denounced it as an "outrage" on Kilgour's part, and that prominent citizens were agitated at the alleged "stifling" by Kilgour of an investigation into the infant's death. The court in that case held that those statements were not libelous, because they did not constitute, considered in connection with their context, "any imputation whatever upon the motives or capacity of the State's Attorney." But here there is no question that the charges are sufficient to impute unfitness to Bowie, if they can be said to apply to him, as for reasons already given in our opinion they do.

The next question is whether, conceding that a cause of action exists, the appellants have stated it properly in their declaration. The first count of the declaration may for the purpose of this opinion be regarded as typical of the others. After stating in a *colloquium* the circumstances surrounding the publication and the situation of the parties, the time and place of the publication, that it was false and malicious, and the text of the alleged defamatory article, the pleader in an

innuendo charged "that persons who read said publication, that is to say, the neighbors and associates of the plaintiff, understood by the statement contained in this publication: the judge's charge also included a stinging rebuke to Sheriff John Bowie of the county,—that this plaintiff in his official capacity as sheriff received a stinging rebuke from his Honor Judge Moss for the derelict, dishonest, or improper manner in which the plaintiff had performed his duties as sheriff of Anne Arundel County," and continuing, he further alleged by way of innuendo, "that these defendants meant when they stated: 'He referred to Garfield Chase (colored) who was employed as a "stool pigeon" by the sheriff's office in running down bootlegs and said repeated attempts had been made to tamper with Chase and make him useless as a State's witness.' He blamed Sheriff Bowie for permitting these attempts,"—to state and indicate and such statement was understood by persons who read said publications, that is to say, the neighbors and associates of this plaintiff, to mean this plaintiff lacked honesty in the exercise of his authority as an official and the sheriff of Anne Arundel County, in that he permitted, that is to say this plaintiff consented to, tolerated, authorized, granted leave by express consent to, empowered expressly, granted express license or liberty to, certain parties to be allowed to tamper with Garfield Chase, a colored man, and thereby to render the said Chase useless as a State's witness; that the said Garfield Chase (colored), described in the aforesaid publication as a "stool pigeon" and a "State's witness," had prior to this publication been and was at the time thereof committed to the custody of this plaintiff by lawful authority, that thereupon it became and was the official duty of the plaintiff to safely keep said Garfield Chase until he was discharged from said custody by due course of law, said publication meaning and being understood by persons who read it to mean in effect that this plaintiff failing in his aforesaid duty in combination with certain other persons in so tampering with Garfield Chase, en-

tered into a conspiracy to obstruct and impede the administration of justice.

The office of an innuendo, as stated in *Flaks v. Clarke*, 143 Md. 380, is "to explain the words published and to give to them their true meaning, but it cannot introduce new matter, add to or enlarge the sense of those words, or impute to them a meaning not warranted by the publication, when taken alone, or read in connection with the inducement and *colloquium*." We are unable to discover anything in the inducement or the *colloquium* which could give to the words last referred to the meaning assigned to them by the innuendo. The plaintiff, by virtue of his office as sheriff of Anne Arundel County, was custodian of the body, but not of the conscience, of Garfield Chase, colored, "stool pigeon" employed in running down "bootlegs." It was not his duty nor had he the legal power to hold Chase *incommunicado*, no matter what his peculiar value as a "stool pigeon" may have been. It is said in the article that the court blamed the sheriff for "permitting" these attempts, to tamper with Chase, and some special significance is sought to be given the word "permitting" and much learning is devoted to its history and meaning in the briefs. But the article in question was not intended for learned scientists but for ordinary people who would possibly read it hurriedly in the office, on the street car, on the train or the automobile, as well as in the quiet of their homes, and to such persons its ordinary meaning would have been that the sheriff did not prevent the attempts to "tamper with Chase." They may have meant that the sheriff permitted them because he could not prevent them. In fact there is nothing in the article or elsewhere to indicate how he could have prevented the attempts, and the ordinary presumption would be that he could not. Certainly there is nothing in the statement to imply that Bowie lacked honesty. Conceding that he had the power to prevent Chase from communicating with other persons, it does not follow that because he did not exercise that power that he was dishonest. He may have been merely careless, or forgetful, or

he may have thought that it would be inhumane or improper to exercise it in that manner.

But while the innuendo is bad because it improperly enlarges the meaning of the words to which it refers, its defects do not vitiate the declaration, but it may be regarded as surplusage, for, as stated in *Newell on Slander & Libel,* par. 758: "But where the words complained of, although their sense may be enlarged by the innuendoes, are plainly actionable on their face, a denial of their truth would be frivolous and nugatory; as, rejecting the innuendo, the cause of action would remain. The denial would be immaterial as an issue of fact and groundless as an issue of law."

It follows that the judgment appealed from must be reversed and the case remanded for further proceedings.

*Judgment reversed, and case remanded for further proceedings.*