## EVENING NEWS COMPANY v. JOHN BOWIE.
[No. 19, January Term, 1928.]

*Decided April 4th, 1928.*

The cause was argued before PATTISON, URNER, ADKINS, OFFUTT, DIGGES, PARKE, and SLOAN, JJ.

*George Weems Williams* and *L. Vernon Miller,* with whom were *Albert M. Bouic, Robert Peter, Jr.,* and *Marbury, Gosnell & Williams,* on the brief, for the appellant.

*Eugene P. Childs* and *L. Wethered Barroll,* with whom were *James J. Lindsay, Jr., Hampton Magruder, L. G. Sasscer,* and *Dawson & Welch,* on the brief, for the appellee.

SLOAN, J., delivered the opinion of the Court.

This is the third time this case has been here. The first appeal was from a judgment on demurrer for the defendant, reported in 148 Md. 569, where this court held the news-

paper article sued on libelous *per se.* The second appeal, reported in 151 Md. 285, was from a judgment for defendant.

The present appeal is from a judgment for the plaintiff, on twenty-six exceptions to the evidence, one to the rulings on the prayers, and one to the refusal of the court to allow the defendant's pleas to be taken to the jury room. But eight of the exceptions to the evidence were mentioned in the appellant's brief or at the argument, though the other eighteen were not abandoned. The twenty-seventh exception covered all the rulings on the prayers, viz.: the granting of the only prayer offered by the plaintiff, and the refusal of the defendant's first, second, third, fourth, fifth, seventh and tenth prayers.

The plaintiff's (appellee's) prayer is: "The plaintiff by his counsel prays the court to instruct the jury that if they find for the plaintiff in this case and shall further find that the plea of justification has not been sustained by the evidence, if the jury shall so find, then the jury may award the plaintiff such damages as in their judgment will be fair compensation for the injury sustained and punish the defendant for publishing the article complained of." This prayer only applies when, on all the facts offered in evidence, the verdict of the jury should be for the plaintiff. It would not apply if the jury had been of the opinion that the libelous article published had been a substantially correct report of so much of Judge Moss' charge to the grand jury as had referred to the plaintiff and the conduct of his office as sheriff of Anne Arundel County. It would not apply if the jury had been of the opinion that the article published by the appellant had not correctly reported Judge Moss' charge, and the appellant had sufficiently proved under its plea of justification the facts therein alleged against the appellee. In either event such a conclusion by the jury would have meant a verdict for the appellant. The verdict for the appellee could only mean that the jury found the appellant had not published a substantially correct report of Judge Moss' charge to the grand jury and had not, under its plea of justification, proven the truth of

the charges against the appellee. This being the effect produced in the minds of the jury by the defense of the appellant, and the publication having been declared by this court, in 148 Md. 569, to be libelous, was the appellee entitled to an instruction to the jury that they could, if they thought the circumstances so warranted, render a verdict for punitive damages?

The appellant relies upon the decision of this court in *Fresh v. Cutter,* 73 Md. 87, as authority for its contention that the appellee's prayer should have been refused. In the *Fresh* case Judge McSherry said of the plaintiff's second prayer that it was erroneous because "it allowed punitive damages to be recovered even though the jury were not required to find the existence of actual malice on the part of the appellant. In cases of this character such is not the law. If the action brings the words within a qualified privilege, no damages can be recovered at all unless the plaintiff shows that actual malice prompted the publication or utterance." The *Fresh* case differs from the instant case in that the defense there was one of privilege only, with no attempt to justify. It is well settled that if a publication is made on a proper occasion, from a proper motive, and defense is made on the ground of privilege, it is necessary for the plaintiff to prove express malice, unless the communication contains expressions which exceed the bounds of privilege. *Bavington v. Robinson,* 124 Md. 85, 90; *Fresh v. Cutter, supra.*

The appellee's contention, as expressed in its prayer, is that if the defendant files pleas of justification which the jury may find to be unsupported by the evidence, this is evidence of express malice. The appellant contends that "a plea of justification, even though unsustained, is not proof of such actual malice as will destroy the defense of privilege," and cites 36 *Cyc.* 1237; *Odgers on Slander and Libel,* 191 and 250, and other authorities. We are aware that there is some difference of opinion as to the inference of malice *vel non* to be drawn from a plea of justification. Of

this situation, *Newell on Slander and Libel* (3rd Ed.), 422, says: "Some of our courts hold that a plea of justification in suits for defamation, if unsupported by evidence is in itself an aggravated repetition of the original defamation and evidence of continuing malice. Other courts hold the contrary doctrine. In some jurisdictions it is held that when the justification is not fully established the circumstances may be considered in mitigation of damages." This court has declared for the rule that unsupported plea of justification is evidence of malice. In *Blumhardt v. Rohr,* 70 Md. 328, 342, it is said: "The appellant had by plea asserted the truth of the charge his language imputed, and if untrue, as the jury found it to be, it was a re-assertion of the slander and, connected with other circumstances suggestive of malice, it could be considered as some evidence of malice; or, as Chief Justice Parsons expressed it in *Wolcott v. Hull,* 6 Mass. 514, where the defendant justified and with proof sought to maintain the charge, 'it is evidence of continuing malice.' " And in *Coffin v. Brown,* 94 Md. 190, 199, 200, it was said: "Although some courts of high authority have taken the contrary view, we are of the opinion that such a plea, when not sustained, is evidence of malice and is an aggravation of the wrong." "By this plea of justification the defendant assumes the serious burden of proving the truth of the defamatory matter" (*McBee v. Fulton,* 47 Md. 403, 428. See also *Blumhardt v. Rohr, supra; Coffin v. Brown, supra; Bowie v. Evening News,* 151 Md. 288) "and is a question for the jury." We find no error in the granting of the plaintiff's (appellee's) prayer.

The appellant's first prayer is the usual demurrer prayer, the second, third, fourth and fifth prayers are respectively demurrers to the evidence under the first, second, third and fourth counts of the declaration. The several counts were respectively based on the four editions of the Baltimore Evening News of October 20th, 1924, purporting to publish a part of the charge of Judge Robert Moss to the grand jury of Anne Arundel County on that day, wherein Judge Moss

is reported to have severely criticised John Bowie, sheriff of the county, and the police officers of Annapolis. The headline of the article, three columns wide, in the first edition of the paper, were "Jurist Hints at Scandal in Anne Arundel"; "Scandal in Anne Arundel County is Hinted"; in the second edition, "County Scandal Hinted," "Scandal in Anne Arundel County is Hinted"; in the third and fourth editions, "Jurist Rebukes Anne Arundel Sheriff," "Sheriff is Rebuked by Judge." In all the editions is a subhead, "Increase of Bootlegging is called Disgrace in Charge to Jury." In the publication, what purports to be the charge of Judge Moss is the following: "Special Dispatch to the News. Annapolis, Oct. 20. Corruption in official circles of Annapolis and Anne Arundel County was strongly hinted at by Judge Robert Moss of the circuit court in his charge to the grand jury this morning. The judge's charge also included a stinging rebuke to Sheriff Bowie of the county. After declaring the increase of bootlegging was a disgrace to the county, Judge Moss said a clean-up of conditions was in order. He referred to Garfield Chase (colored) who was employed as a 'stool pigeon' by the sheriff's office in running down bootlegs and said repeated attempts to tamper with Chase and make him useless as a State's witness had been made. He blamed Sheriff Bowie for permitting these attempts and intimated that a member of the city police force was responsible for them. The court insisted that Chase be indicted either for bootlegging or for perjury and urged the jury to go to the bottom of the plot to save those against whom Chase was to testify."

The appellant's five prayers are really demurrers to all the evidence, as the only differences are in the headline, the news article being the same in all four editions of the paper. The only possible reason for offering these prayers is on the hypothesis that the publications were all substantially accurate and fair reports of the charge of Judge Moss to the Anne Arundel grand jury, and that they are within the bounds of privilege. Unless there be express malice, which

in such cases the plaintiff must show, "a report will be privileged if it is substantially a fair account of what took place in court." "It is sufficient to publish a fair abstract." *Newell on Slander and Libel* (3rd Ed.), 669. "Reports of proceedings of courts of justice are privileged by the occasion, if fair, *bona fide* and impartial, though defamatory of individuals and published to the world at large." *McBee v. Fulton,* 47 Md. 403, 417.

There is no question here that the publication sued on comes within the class of qualified privilege, and that, in the absence of malice, if it was a fair, *bona fide* and substantially accurate report of Judge Moss' charge, the appellant would be entitled to a verdict. If the facts are uncontroverted and there is no evidence of express malice, the question is one of law for the court. *Bavington v. Robinson,* 124 Md. 85, 90. In that case the court, quoting from *Fresh v. Cutter,* 73 Md. 87, said, "Expressions in excess of what the occasion warrants do not *per se* take away the privilege, but such excess may be evidence of malice."

There is no evidence in this case that the appellant was moved by any hostility, hatred, or ill will toward the appellee in publishing the news item complained of. The situation here was aptly stated in *Conroy v. Pittsburgh Times,* 139 Pa. 334, 339: "Libelous articles in newspapers seldom spring from any hostility to the individual, but usually from a ruthless disregard of personal feelings and private rights in the mad hunt for news and sensations." It has already been decided by this court, in 148 Md. 569, that the publication is libelous *per se,* and its only excuse is the appellant's claim that it was a fair, *bona fide,* and substantially correct report of Judge Moss' charge. In *Garrett v. Dickerson,* 19 Md. 418, 450, it was said: "Words ascertained to be privileged as matter of law still involve the element or fact of good faith in speaking them, and that in general, evidence of any act or circumstance tending to show the want of good faith may be offered to remove the protection of privilege, and show the existence of malice." *Bavington v. Robinson,* 124 Md. 85, 90; *Jump v. Barnes,* 139 Md. 101, 106.

612

The evidence as to what Judge Moss did say in his charge is controverted and fragmentary, and so contradictory as not to warrant this court in saying, as a matter of law, that the publication sued on was a fair, *bona fide,* and substantially accurate report of his charge. The circumstances under which the news was gathered and reported do not aid in convincing us of its accuracy. "Newspapers have no particular privilege and are required to exercise due care in gathering and publishing public happenings." 36 *C. J.* 1273; *State Journal v. Redding,* 175 Ky. 388; *Conroy v. Pittsburgh Times, supra.*

The evidence is that the Evening News correspondent at Annapolis was not in the court-room when Judge Moss charged the grand jury and did not hear the charge. He had heard of it and went to the court-room, and made inquiry, from four or five persons who were present, as to what Judge Moss had said. "I feel sure that one of them was a member of the bar and that they were all people who were capable of stating what happened, * * * and as a result of that I had it pretty clearly in my mind that the judge had said certain things; and I framed the story or rather I took notes. * * * I had regarded the story as a very important news story. * * * So when I had the story framed in my mind I * * * called up the office. * * * The facts that I am reasonably sure of are that the judge scored conditions in the county at large in regard to the selling of liquor and certain conditions at the jail; and that he had criticized official action on account of this Garfield Chase incident. That is all I remember with any clearness." He could not remember any of the persons from whom he got his information and did not get a verification of the story from Judge Moss.

Judge Moss testified that he had sent the sheriff (appellee) to make an investigation for him of the Garfield Chase incident, and that the sheriff had reported that investigation, which was a verification of the street rumor and more in detail. Garfield Chase, a negro, himself charged with "boot-

legging," was a witness against another "bootlegger." Some friends of the latter, including a justice of the peace, a notary and a chum of Chase, went to the jail and obtained from him a statement which was a repudiation of his story before the magistrate. After referring to certain matters in his charge, Judge Moss testified: "Then I passed to this other matter and, as I repeat, I may have said 'Sheriff Bowie has verified this information for me,' or something of that kind. That is as far as I went on that. I then told the grand jury about this transaction as it had been reported to me by Sheriff Bowie. * * * I didn't say anything as to conditions at the jail. * * * I did not say that they ought to find him (Chase) guilty of perjury * * * I told them about conditions in the upper part of the county. * * *" As to bootlegging "It is my impression that I said it was a disgrace to the county. * * * Q. What did you say in reference to the management of the jail in regard to this permitting of an attempt to tamper with Garfield Chase, in your charge to the grand jury? A. I said nothing directly, but when I declared that it was done without permission of the sheriff's office or the state's attorney, you could call it an implied criticism of the warden of the jail for letting them in. Q. Why did you put it on the warden? A. I didn't put it on the warden; I impliedly blamed the warden because he was there and the sheriff was not there. * * * Q. Now did you say in your charge to the grand jury that the system at the jail was lax and that people were allowed to go in and out at will * * *? A. I am about as certain as I can be of anything that I did not say it. You are dealing with generalities, I was dealing with a specific offense at the jail for a specific purpose."

It does not appear anywhere in Judge Moss' testimony that he blamed Sheriff Bowie for the increase of bootlegging in the county, for lax conditions at the jail, or for permitting the tampering with the witness Chase. The only conclusion to be drawn from Judge Moss' testimony is that his sole reference to the jail was to the tampering of outsiders with Chase, and he got the information upon which he based his charge from the sheriff himself. There was other evidence that the

Chase incident was the only reference made to the jail or to the sheriff in the charge. There was no testimony from any of the witnesses that Judge Moss administered "a stinging rebuke to Sheriff Bowie of the county," except from two policemen, one of whom said that Sheriff Bowie told him "that Judge Moss raked him over the coals and also myself"; the other, "I heard Judge Moss say in his charge to the jury about Sheriff Bowie and about the police force in Anne Arundel County and also Annapolis not trying to enforce the law." It is evident that the testimony as to what Judge Moss said in his charge to the grand jury is conflicting and contradictory, and that the question of privilege in this case was for the jury. *Bavington v. Robinson, supra.*

The first sentence of the "Special Dispatch to the News" was, "Corruption in official circles was strongly hinted at by Judge Robert Moss of the circuit court in his charge to the grand jury this morning." The word "corruption" does not appear in the evidence in this case except in the publication. Judge Moss did not use it and never testified that he did, nor was there any evidence of any charge of corruption having been made or "hinted at." There was no evidence that the appellant's newspaper correspondent at Annapolis gave any information to the paper of Judge Moss' charge from which a hint or a charge of corruption might be inferred. It was the inference drawn by the appellant's editors or writers from the substance of the charge as given second hand to the Annapolis reporter and relayed by him to Baltimore by telephone. After the first sentence the article is substantially as the correspondent testified he gave it to the paper. These facts, as related by the correspondent, if Judge Moss was correctly reported, were charges of certain laxity, carelessness, or negligence of the sheriff's office in the enforcement of the liquor laws and in the management of the jail, but it is a far cry from laxity and negligence to corruption, which is as ugly a word as can be fastened on a public official. In this publication the only official of Anne Arundel County mentioned was Sheriff Bowie, and, when "corruption in official circles of * * * Anne Arundel County was strongly

hinted at" in this publication, the reader would naturally infer that it was intended for the only county official named in the article, and that is Sheriff Bowie. If Judge Moss had made the charge or hint of corruption, the appellant would have been protected by its qualified privilege. It was the appellant's conclusion as to the meaning of what it published as Judge Moss' charge, and when it drew such an inference it took the risk of a jury's construction. Because of the contradictory testimony as to what Judge Moss did say, the question of privilege, which was submitted to the jury by the appellant's sixth and ninth prayers, the appellant's first, second, third, fourth, and fifth prayers, to take the case from the jury, were properly refused.

The appellant's seventh prayer was for an instruction that there was no proof of actual or express malice, and if the jury found the publication sued on to be a substantially correct report of Judge Moss' charge, their verdict must be for the defendant. This was properly refused, because the finding of malice depends upon a finding of the substantial accuracy or inaccuracy of the report of the charge. If the report of the charge in this case was substantially correct, there was no malice; otherwise, if incorrect; unless the plea of justification had been sustained. The appellant's tenth prayer was for an instruction that there was no legally sufficient evidence to entitle the appellee to punitive damages. What we have said of the plaintiff's prayer applies to this prayer, and there was no error in its refusal.

The twenty-eighth exception was to the refusal of the court to grant the request of the appellant's counsel to allow the jury to take with them to the jury room the pleas of the appellant, and particularly the plea of justification. The request was made on the theory that the pleas were necessary to supplement the plaintiff's prayer. The authority which the appellant cites (*Hilchins v. Frostburg*, 68 Md. 116) is authority for the court's refusal to yield to the appellant's request, as that case declares that the matter is within the discretion of the trial court and not subject to review on appeal. In the opinion in that case, it is said that the

issues raised by the pleas are supposed to be fully explained to the jury in the course of the trial and "the jury are not left to grope through the technical verbiage of the pleadings to ascertain for themselves what issues are required to be determined."

We will next take up the exceptions to the evidence to which the appellant referred in its brief and at the argument. The first of these, the sixth, is the exception taken on objection to the plaintiff's question, "In what manner, if at all, did you refer to Sheriff Bowie in your charge to the grand jury?" We fail to see the ground of this objection. The inquiry was as to the correctness or incorrectness of the report of Judge Moss' charge to the grand jury in so far as it referred to Sheriff Bowie, and the question could have had no other purpose. Although the court refused to allow the question on cross-examination covered by the eighth exception, it was immediately followed by a question to the same effect which was answered without objection. The twelfth exception was to the refusal of the court to strike out Judge Moss' answer to the question, "What did John Bowie do while sheriff during his last term of office to check bootlegging in Anne Arundel County?" to which Judge Moss answered, "Bowie did all that was reasonably in his power to do to enforce the law," and then went on to give some instances of special efforts made under the judge's direction and at his request. This answer may be general, but inasmuch as the defendant under its plea of justification was attempting to show that Sheriff Bowie was doing practically nothing to enforce the liquor laws, the appellee was entitled to prove whether the sheriff was diligent in enforcing the law. The defendant's brief indicates that its chief objection was that the jury was bound to be impressed by the fact that Judge Moss was giving the plaintiff a clean record "in the manner in which he performed his duties." This is hardly consistent with the defendant's claim of privilege, based on the alleged remarks of the same judge, which it says were directed against the sheriff.

The seventeenth exception was to the question of Judge

Worthington to the witness Chase, "Who lived at the jail and had charge of it actually while you were there?" This is evidently based on the fact that, while the sheriff did not live in the jail, the warden, who was appointed by the county commissioners and not by the sheriff, did live there, and although the sheriff was held, under the last decision in this case (151 Md.), to be responsible for the conduct of the jail in spite of the fact that there was a warden so appointed, the jury was entitled to know to what extent the sheriff had personal knowledge of what went on at the jail. There is evidence in the record that the sheriff did not personally know, until informed by Judge Moss, of the tampering with the witness Chase. In the first sentence of the newspaper article, "corruption" of county officials is strongly hinted at, and the nearest approach to corruption in this case would be a charge of subornation of perjury, and if the sheriff did not know about this the hint in this instance could hardly apply. Then, too, after the evidence was in the jury were instructed by the appellant's eighth prayer, which was granted, that the sheriff was the legal custodian of the prisoners at the jail.

The eighteenth and nineteenth exceptions were on questions put to A. Theodore Brady, state's attorney for Anne Arundel County, as to what statements of fact in the publication were or were not correct. This is an inquiry as to what Judge Moss said in his charge, and Mr. Brady, who said he was present when the charge was delivered, could have been asked what Judge Moss said, and he might have used the publication to refresh his recollection, but for no other purpose.

The twentieth exception was to the refusal of the court to permit the grand jury report of its investigation of the jail to be offered in evidence. The members of the grand jury might have been called and examined as to their investigations of the jail and the sheriff's management of the same, and the plaintiff would then have had an opportunity to cross-examine them on their direct testimony. This was only pertinent under the plea of justification, which was an

attack on the sheriff's conduct of his office and management of the jail. *Havenor v. State,* 125 Wis. 444. The twenty-fifth exception was to the question, "What was the relationship between these two officers (the sheriff's chief deputy and Curry, a police officer of Annapolis) relative to the enforcement of the liquor laws?" to which Sheriff Bowie answered, "No co-operation." It was then objected to. The objection was not to the question, and there was no motion to strike out either the question or the answer. Curry had testified for the defendant, and at most it could only have been permitted for the purpose of showing that their official relations were not cordial. Neither question nor answer could possibly have had any effect on the result. One of the grounds of objection to this question was that the relationship between the police officers of Annapolis. and the sheriff's deputy was not relevant to the issues. Curry had testified that there "is only one jail at Annapolis; that is for the county and city prisoners," so that the officers of the county and city must have had frequent contact in the jail at least.

The first four unargued exceptions were on questions directed to employees of the News to disprove malice. Inasmuch as the court instructed the jury that, if the publication was a substantially correct report of the judge's charge, then they should find for the defendant, the element of malice was eliminated, and no harm done by the refusal of the court to allow these questions. The fifth exception was to questions to Judge Moss as to whether he had had any prior information as to the matters mentioned in the charge, to which he answered "Yes," in which we see no impropriety. The seventh exception was in substance a question asked of and not answered by Judge Moss during his examination. The same thing applies to the ninth. The tenth was on sustaining the objection to a question asked Judge Moss as to whether or not he "put it up pretty strongly." If the charge was sensational enough to cause the publication, the defendant had answered this in advance of the trial by the publication. The eleventh was a question to Judge Moss as

to whether the appellee had told him after the suit was brought that Epstein was going to tell the Baltimore News people that he took a drink at the jail. This matter was all brought out in the evidence, so that it was only a repetition of what covers pages of the record. The thirteenth, fourteenth, fifteenth and sixteenth exceptions were all taken while Mrs. Strahorn, the court stenographer, was on the stand, and every one of the questions asked and objected to and the answers moved to be stricken out were to questions asked and answered without objection several times of witnesses during the trial. Their propriety or impropriety did not exclude or admit the testimony offered, as it all was in the case without objection.

The twenty-first was on a motion to strike out the testimony of Mrs. Strahorn, a witness offered by the plaintiff to attack the credibility of one of the defendant's witnesses. Mrs. Strahorn testified that she knew his reputation for truth and veracity and had heard it discussed in the community, and the court held her properly qualified to testify and refused the motion. The twenty-second, twenty-third, twenty-fourth, and twenty-sixth were on objections to questions put to the appellee for the purpose of showing in part what efforts he did make to enforce the liquor laws in his county, and were clearly admissible in answer to the plea of justification, and proper for the jury to consider.

Finding no reversible error in the rulings on the evidence, and no error in the rulings on the prayers, the judgment of the trial court will be affirmed.

*Judgment affirmed, with costs.*