## WILLIAM J. FOLEY *v.* N. BOSLEY HOFFMAN

[No. 98, October Term, 1946.]

274

*Decided April 17, 1947.*

The cause was argued before MARBURY, C. J., DELA-PLAINE, COLLINS, GRASON, HENDERSON, and MARKELL, JJ.

*Hilary W. Gans* and *Joseph T. Brennan, 2nd,* for the appellant.

*Kenneth C. Proctor* and *Edward H. Burke,* with whom were *Bowie, Burke & Leonard* on the brief, for the appellee.

MARKELL, J., delivered the opinion of the Court.

This is an appeal by the defendant from a judgment for $3,500, entered after a verdict for $25,000, a motion for judgment *n. o. v.* or, in the alternative, a new trial, and a *remittitur* of $21,500 in lieu of a new trial, in an action for libel.

The defendant was elected Treasurer of Baltimore County in 1942 and took office on December 14, 1942. Plaintiff had been Chief Clerk in the Treasurer's office since 1936, under defendant's immediate predecessor, and had been a clerk in the office since 1918 under two of defendant's predecessors. Plaintiff and all but one of the other employees were continued in office by defendant.

In May, 1945, plaintiff informed defendant that two cash deposits, which should have been made in the Tax Levy account, apparently had not been made but had been

stolen. Defendant suggested that plaintiff make a further search in other accounts. The next day plaintiff reported that he could not find the deposits anywhere. Defendant then notified the Treasurer's counsel, Mr. Duncan, the County Commissioners and the State's Attorney. Thereafter the certified public accountants who audited the accounts of the office were asked to investigate every item beginning January 1, 1945. While the auditors were making their investigation, the State's Attorney conducted an independent examination by interrogating separately, in the presence of defendant and his counsel, all the employees in the Treasurer's office.

After completion of this investigation in July, 1945, defendant and his counsel conferred with the County Commissioners, and on July 27th defendant delivered to plaintiff and one other employee letters, prepared by his counsel, requesting their immediate resignations. The other employee resigned; plaintiff refused to do so and was dismissed. On July 31, 1945 the Baltimore Sun published a report of the dismissal of two employees (not named), including statements by the State's Attorney and defendant. Defendant stated, *inter alia,* "As a result of the investigation, I learned of certain conditions in my office, none of which had any criminal aspect, and as a result of this knowledge I requested the resignation of two members of my staff." Plaintiff demanded a grand jury investigation. On August 8, 1945 the Sun so stated and quoted a letter from plaintiff to defendant refusing to submit his resignation "until such time as the request for my resignation will not carry with it the implication that my integrity is in question," and also denying that he had been "guilty of inefficiecy or neglect."

After completion of the audit, which showed $1,997.76 missing for the period from January 1, 1945, to July 31, 1945, the grand jury undertook an investigation, which culminated in the following report, filed September 11, 1945, quoted at length in the Baltimore Sun on September 12, 1945 and in other newspapers:

"We, the members of the May, 1945, Grand Jury have made a thorough and searching examination of the evidence presented regarding the shortage of certain money in the Treasurer's Office and have not found sufficient evidence to present any indictments. From the evidence received, we find the following conditions existing:

1. The Treasurer's Office embracing petty jealousies, disharmony and general mismanagement.

2. An auditor's report that $1,997.76 is missing from the audit for the period January 1, 1945 to July 31st, 1945.

3. Irregularities in the accuracy in the overtime payments.

4. The abatement of levies in taxpayers accounts without explanation.

5. Failure of the cashiers to strike a daily balance.

6. No locks on the cashiers cash drawers.

7. Money exposed without adequate safe-guards.

8. The interchange of cashiers at the windows without the proper changing of any identification numbers on perforating machines.

9. The practice of the same individual having access to the cash, stubs and posting to the tax ledgers.

We, therefore, make the following recommendations:

1. The employment of a qualified certified public accountant as chief clerk.

2. More complete yearly audits employing a different qualified auditing firm each time.

3. The installation in the Treasurer's office of modern bookkeeping machines and methods comparable to those now used in the Baltimore City Collector's Department.

4. Installation of time recording clock in the Treasurer's Office.

5. No overtime should be paid to any employee in a supervisory capacity.

6. Balance ledger and cash monthly.

7. Enclosed cages for cashiers with sufficient space to safe-guard accumulated cash until such time as money is deposited in the bank.

8. More daily bank deposits.

9. Individual cashier's cages each equipped with burglar alarm buttons connected to the Police Station."

On September 14, 1945 the Baltimore Sun and the Jeffersonian published the following statement by defendant:

"The grand jury confirmed the need for a new chief clerk thereby approving my action in removing Mr. N. Bosley Hoffman from that post several weeks ago.

"The jury has also made public certain conditions in the office which came to my attention as a result of the audit and investigation, and which caused me to ask for the resignations of Mr. Hoffman, whom I held responsible for the office routine and clerical supervision, and of Mr. Charles S. White, Jr., who assisted him in many of his duties.

"Mr. Hoffman had been in charge of the office under my predecessor and, because of his length of service and experience in the work, I assumed him to be qualified to continue in the same position of chief clerk when I took office. In this I now find I was mistaken.

"I am convinced that Mr. Hoffman and Mr. White were largely responsible for the petty jealousy and disharmony mentioned by the jury, as well as for the carelessness in handling funds and records revealed by the jury and that I was justified in removing them from my staff on the grounds of inefficiency and neglect.

"As to the jury's recommendations pertaining to the modernization of the office, I have attempted to do some of the very things they suggest but have been handicapped by lack of space and inability to obtain the necessary mechanical equipment because of the war.

"As a matter of fact, efforts to purchase the modern equipment were made early in my term.

"The War Production Board, which had complete control over the distribution of such equipment throughout the war, turned down our application for priorities.

"I have been informed recently that such equipment is no longer under priorities and will be available within

a few months, I am also assured of ample space for equipment and for cashiers' cages in the proposed addition to the court house, for which plans are nearing completion.

"Improvements have already been made in the method of keeping records and safeguarding funds, and the certified public accountants will be instructed to make a more detailed audit in the future.

"The shortage is fully covered by bond, so that the taxpayers of the county will suffer no loss in this affair, and I am determined to do everything humanly possible to prevent the recurrence of anything of the sort again."

On November 30, 1945 plaintiff filed his declaration, setting out in two counts the above statement in the Sun and substantially the same statement in the Jeffersonian, and alleging (with colloquium and innuendoes) that defendant "falsely and maliciously" caused to be published the matters set forth, "which are false, scandalous, malicious, injurious, libelous, damaging and defamatory of and concerning the plaintiff as a clerk and public servant." A demurrer to the declaration was overruled. Defendant pleaded the general issue and justification. At the trial defendant relied on the defenses of fair comment and justification. Both defenses were submitted to the jury by written prayers, which are not printed in the appendix to either party's brief.

When a tax bill is paid in currency at the Treasurer's office, the bill is receipted by a perforating machine and handed back to the taxpayer, and (1) the money is put in the cash drawer, (2) the stub (a duplicate of the bill) is put on a file of stubs, and (3) the payment is posted on the tax ledger. In the course of a day the cashiers at the windows are frequently changed. If the same individual has access to the cash, stubs and posting on the tax ledgers, he may by taking any cash payment and the corresponding stub and posting the payment on the ledger, prevent detection at least until the next audit, or without posting on the ledger, until the taxpayer next asks for or pays a bill and his account is found "open."

Even when the theft is discovered, the thief cannot be discovered unless his identity is shown on the receipt or the ledger—or remembered by the taxpayer. Without taking stubs at all, thefts may be long concealed if all receipts each day are not checked with the stubs and deposited before the beginning of business the next day; a shortage at the end of one day may be covered by taking a like amount from the next day's receipts. Mr. Selfe, chief clerk and auditor of the county commissioners since 1938, testified that in his previous experience as a public accountant he had found several defalcations effected through just such operations.

It seems to be agreed that the best safeguard against such thefts would be use of cash registers which will receipt and stamp each tax bill and stub, showing the clerk making such transaction and the amount received, and will also total the amount of the receipts during the day. Without such machines, however, the same ends may be less easily attained, or at least pursued, by use of identifying numbers, for each clerk, on the perforating machines, by daily totals of receipts and stubs at the end of the day, by setting apart the day's receipts and depositing them (i. e., the part not already deposited during banking hours of the same day) at the beginning of business the next morning, by not giving the same individual access to cash, stubs and ledger posting, and by frequent audits by independent auditors. No doubt more or better precautions may be, or from time to time become, necessary or advisable. No mechanical or other devices can make theft impossible. Nor is hindsight the measure of care or competence. But neither in private business nor in public office can theft properly be tolerated as routine, without unceasing vigilance to prevent it and to learn by experience how to do so. More unusual than theft itself is a system, or lack of system, of conducting business, which after discovery of theft by some employee makes it impossible to identify the guilty one.

Plaintiff, as chief clerk, was practically deputy treasurer, in charge of office routine and clerical supervision. In the absence of defendant he was in charge of the office. Defendant usually left the office about the end of regular office hours, four o'clock or part of the year three o'clock. During the early months of the year there was much overtime work, from four o'clock until nine, for which the employees engaged in such work, including plaintiff, received extra compensation. Defendant before he was elected Treasurer had not been employed in the office. The extent of his experience with similar work is not shown. We may assume, without deciding, that his pecuniary responsibility for thefts in his office was not diminished or affected by lack of experience or failure to familiarize himself with office details and system, or lack of system, or by undue reliance on subordinates. Nevertheless, every public officer or private business executive is to a greater or less extent required to rely upon subordinates. Indeed, if one is not himself competent to master the details of his office or employment, it is imperative that he have a competent deputy. When a public scandal arose upon discovery of thefts in the Treasurer's office, it was defendant's right, if not his duty, to give the public, taxpayers and voters, what explanation he could of how the thefts had occurred and what he was doing to prevent recurrence. In the statements now the basis of suit he made no intimation who was guilty of the thefts but expressed himself as to alleged inefficiency and neglect which made them possible.

Plaintiff admits, and indeed asserts, that in 1941 a defalcation in the Treasurer's office "occurred in exactly the same way" the one in 1945 occurred, *viz.*, by one of the cashiers (not still an employee in 1945) taking money and stubs and stamping the accounts "paid" in the ledgers. One taxpayer had gone to this cashier's house and paid his taxes. The next day the cashier brought him the receipt back, having kept the money and the stub but forgotten to stamp the account "paid." Later when the taxpayer went to the office to get a tax bill and

was told the previous taxes were unpaid, he said he had a receipt and told plaintiff to whom he had made payment. The man admitted to plaintiff that he had kept the money and the stub. Investigation disclosed a number of accounts stamped with the man's initial, for which stubs were missing. The man admitted his guilt. Eventually a "batch" of stubs was brought in, restitution was made by him or his bonding company, there was no prosecution and no publicity. Plaintiff says restitution was made in all cases found, but he "couldn't swear whether they found them all or not."

Before defendant took office in December, 1942 apparently nothing was done or suggested by plaintiff, or done by the Treasurer, to prevent recurrence of the 1941 thefts. The only educational effect of that experience seems to have been to teach the 1945 culprits not to initial their ledger entries. Mr. Selfe testified that after he became chief clerk and auditor of the county commissioners in 1938, he had discussions with plaintiff and defendant's predecessor concerning systems then in vogue in the Treasurer's office and made suggestions to them to remedy the situation. He had observed that the method of handling the public funds and records in that office was inadequate, and for one thing, there was no safeguard thrown around the cash, which had never been deposited intact, daily, and the balances that were closed at the end of the month would run anywhere from two or three to eight days, and he made the suggestion "that the deposits be made daily for every nickel that was taken in." The Treasurer and plaintiff "agreed" that this could not be done, that it was not practicable, that with the volume of work they did it was not possible to get the settlements made daily. Since July 20, 1945 all collections of taxes are deposited daily intact. In the spring of 1940, Mr. Selfe testifies, he had a meeting with the county commissioners, the Treasurer and plaintiff regarding (1) deposits daily of all cash collections intact and (2) acquisition of cash registers of the kind above mentioned; the Treasurer and plaintiff then opposed acquisition of

the cash register. At that time such cash registers were available; after the United States entered the war, they were not available for civilian use. It was testified by the present chief clerk in the Treasurer's office that such cash registers had been ordered in January, 1946 but could not be expected within six months after May, 1946; that the clerks who receipt bills are identified by inserting in the perforating machines individual plates, which apparently had previously been in the office but had not been used; that cashiers are not permitted to post the ledgers; and that there are audits every few days.

Plaintiff says, "To my knowledge he [Selfe] never mentioned a cash register," but admits that he himself said he could not make daily deposits as Selfe advised. He says, he told defendant that the main thing needed in the office was something at the cashier's window, *i. e.*, cash registers; he said, "let us go in to Baltimore to see whether we can see the machines they have there," defendant said, "we will do that"; he told defendant that what was really needed was something similar, but nothing was ever done about it; defendant said Selfe was handling the thing and was trying to get some things put in; plaintiff understood, was told by somebody, that cash registers could have been obtained during the period from 1942 to 1945; he couldn't swear whether the representative of the National Cash Register Company came to his office and tried to "sell" him on the idea before the war and later, because of the war, they stopped making those machines for civilian consumption.

Defendant, in his brief and at the oral argument, contends that reversible error occurred (1) in overruling the demurrer to the declaration, (2) in excluding from the evidence the grand jury's report of September 11, 1945 and the newspaper account of the report, and (3) in granting plaintiff's first and second prayers. At the argument it was also suggested that defendant's motions for a directed verdict and for judgment *n. o. v.* should have been granted.

As the declaration does not allege special damage, it is demurrable unless the publications are libelous *per se.* The scope of libel is wider than that of slander; libel includes any unprivileged, false and malicious publication which by printing, writing, signs or pictures tends to expose a person to public scorn, hatred, contempt, or ridicule. *Bowie v. Evening News,* 148 Md. 569, 574, 129 A. 797. With respect, however, to words injurious to a person only in his office, trade, business or employment, in the absence of aggravating language or circumstances, especially when the publication is qualifiedly privileged, the border line is much the same for libel as for slander. See, however, *Restatement, Torts,* sec. 569, e. In *Kilgour v. Evening Star Company,* 96 Md. 16, 24, 25, 53 A. 716, 717, it was said: " 'The words must go so far as to impute to him some incapacity or lack of due qualification to fill the position, or some positive past misconduct which will injuriously affect him in it.' *Sillars v. Collier,* 151 Mass. 50, 23, N. E. 723, 6 L. R. A. 680; * * * in order to find the words of this publication libelous, we must be enabled to determine that they impute to the appellant, as an attorney and state's attorney, some base or corrupt motive or incapacity in the discharge of the duties of such office, or, as stated by Newell, some 'unfitness to perform' the duties of the office, or 'want of integrity in the discharge of them.' " See also *Bowie v. Evening News,* 148 Md. 569, 129 A. 797.

It has been held that "incapacity or lack of due qualification" to fill a position is not necessarily imputed by charging a single act of carelessness. Such a false statement, *e.g.,* of a physician, might be "rather indicative of human imperfection than of general professional incompetency or gross disregard of professional duty." *Newell, Slander and Libel* (4th Ed.), sec. 138; see also note, 124 A. L. R. 553, as to physicians, and note, 144 A. L. R. 814, as to attorneys. In *Ratzel v. New York News Publishing Co.,* 67 App. Div. 598, 600, 73 N. Y. S. 849, 850, it was held that a published notice that two named employees "have been dispensed with" because of "a gene-

ral careless manner of attending to our business," and would be replaced by "competent parties, who will attend to our affairs in a more business-like manner," did not imply that the plaintiff was "unfitted, unskilled and incompetent," but was "entirely consistent with the fact that the plaintiff was fitted, skilled and competent" and was not libelous *per se*. In *Walker v. Best,* 107 App. Div. 304, 305, 307, 95 N. Y. S. 151, the Ratzel case was followed, and a statement in a report, that a school teacher was "careless" in blackboard work, was held not to be libelous *per se*. These two cases were decided, in two different Departments of the Appellate Division, by distinguished judges, three of whom later became more distinguished as judges of the Court of Appeals. On the other hand, the *Restatement, Torts,* limits this doctrine to slander, as distinguished from libel. *Cf.* secs. 569, e and 573, d.

In the instant case the publications do not imply any want of integrity on plaintiff's part. However, assuming, without deciding, that we would follow the New York cases cited, we think it clear that these publications impute to plaintiff, not a particular act of carelessness, or carelessness in some particular minor respect, but general incapacity or lack of due qualification to fill the position of chief clerk. The statements that "I assumed him to be qualified to continue in the same position of chief clerk when I took office. In this I now find I was mistaken. * * * I am convinced that [he was] largely responsible * * * for the carelessness in handling funds and records revealed by the jury and that I was justified in removing [him] from my staff on the grounds of inefficiency and neglect" are susceptible of no other construction.

Nor does the declaration disclose any facts which show that these statements were actually true. It does contain a remarkable averment that "the system of accounting in the office of the Treasurer * * * at the time the defendant took office * * * was one which lent itself readily to embezzlement by persons employed in

said office without fear of detection," and no specific averment that defendant did *not* rely upon plaintiff "for the office routine and clerical supervision," but it does not aver what the actual duties of the "Chief Clerk" were, does not mention the 1941 thefts and does not show anything plaintiff did or left undone, by act or suggestion, to create, prevent or correct such system. We, therefore, find no error in overruling the demurrer to the declaration.

We need not pass upon plaintiff's contention that the statement that plaintiff was "largely responsible for the petty jealousy and disharmony mentioned by the jury" is libelous *per se*. Petty jealousy usually is a trait of petty natures and commonly causes disharmony. Many judicial decisions are, like the judgment of Paris, in a sense "responsible" for petty jealousy—or epic jealousy—without fault or incompetence on the part of the judges. In the plea of justification it was alleged that the petty jealousy and disharmony was principally provoked by favoritism on plaintiff's part. At the trial, there was much contradictory testimony on this question. If the original statement was not libelous, the charge of favoritism in the plea would not make it so. The question of favoritism had little, if any, relevance to the real issues.

The grand jury report (and the newspaper account of it) should have been admitted in evidence. It was *the* subject of the alleged libelous statements. To determine whether the statements were fair comment on the report, the report was evidence as necessary as the statements. Plaintiff gave the first publicity to his own dismissal by publishing his demand for a grand jury investigation and characterizing his dismissal as "carrying with it the implication that my integrity is in question." The grand jury investigation and report were made in response to his demand. Defendant's statements were comments on the report and in effect a reply to plaintiff's first publication; they do not reflect on plaintiff's integrity. The report received full publicity.

If defendant's statements added little or nothing to the implications of the report regarding plaintiff's qualification and efficiency, they caused him little or no damage. Furthermore, if defendant believed the findings in the report to be true, such belief might in whole or in part rebut the inference of actual malice if the plea of justification was not sustained. We think the report was admissible on the  questions of fair comment, damages and actual malice.

Exclusion of the report was reversible error. The report did not mention plaintiff by name (*Goldsborough v. Orem & Johnson,* 103 Md. 671, 64 A. 36), but it indicated, no less than defendant's statements, inefficiency and lack of qualification as chief clerk. The grand jury, *inter alia,* found "general mismanagement" in the Treasurer's office, "failure of cashiers to strike a daily balance," "money exposed without adequate safeguards," "the interchange of cashiers at the windows without the proper changing of identification numbers on the perforating machines," "the practice of the same individual having access to the cash, stubs and posting to the tax ledgers," and recommended "the employment of a qualified public accountant as chief clerk," "more complete yearly audits," and "more daily bank deposits." The recommendation of employment of a qualified public accountant as chief clerk necessarily implies that the office of chief clerk requires qualifications higher than plaintiff possesses. Denying that a person possesses special knowledge essential to the proper conduct of his particular employment is libelous, if false (*Odgers, Libel and Slander,* (6th Ed.), 45-46; *Newell, Slander & Libel,* (4th Ed.) sec. 139)—but unfortunately is sometimes true, *e.g.,* when a capable clerk or other employee is promoted to a higher employment and is found wanting. Anyone familiar with the well-known fact that such officers as County Treasurer commonly rely largely on their deputies or chief clerks for office routine and clerical supervision would understand that "general mismanagement" and other findings above quoted indi-

cate inefficiency on the part of the chief clerk. The findings in the report are supported by substantial evidence in the instant case. Without the report itself in evidence, the long verbose trial was a performance of "Hamlet" with Hamlet left out.

In *Evening News Co. v. Bowie,* 154 Md. 604, 141 A. 416, the alleged libel was a newspaper report, alleged to be inaccurate, of a charge to a grand jury by Judge Moss. The defenses were (1) that the report was substantially correct and (2) that the statements in the report concerning plaintiff were true. This court held that, generally speaking, *either* defense would be sufficient (154 Md. 607, 141 A. 416), though on a former appeal it had held that a statement true in itself, but falsely ascribed to Judge Moss, might be libelous. *Bowie v. Evening News Co.,* 151 Md. 285, 295-296, 134 A. 214. On the second defense the defendant offered a report of the grand jury, which was properly excluded as hearsay. Testimony as to what Judge Moss actually said (the subject of the newspaper report) was admitted. The *Bowie* cases do not support exclusion, but admission, of the grand jury report in the instant case.

We cannot, without departing from the spirit as well as the letter of our rules, pass upon defendant's motions for a directed verdict and for judgment *n. o. v.* These questions were not argued or mentioned in the briefs, nor do the appendices to the briefs contain enough of the evidence for determination of its legal sufficiency—or conclusiveness—to support or compel a verdict. The rule dispensing with printing of records is designed to facilitate by condensation, not to prevent, full consideration of each case by all the judges. In the opinions of this court facts shown in the appendices are sometimes amplified and details supplied from the transcript, but it is nevertheless expected and must be assumed that the appendices contain, in substance, all that is needed for decision of the case. In the instant case we do not mean to suggest that it would have been necessary to print all—or half—of the voluminous record

in order adequately to present any questions involved in the motions for a directed verdict and for judgment *n. o. v.*

We think that, without violating the spirit of our rules, we may say a word regarding plaintiff's first and second prayers, which were argued but not set out verbatim in the briefs. The first prayer, that if the verdict is for the plaintiff and "the plea of justification has not been sustained by the evidence," the jury may award punitive damages, was held proper in *Evening News Company v. Bowie,* 154 Md. 604, 607-609, 141 A. 416. If in the instant case defendant confused the issue by going beyond his original publications in his plea of justification and his evidence, we do not think this prayer was erroneous, at least in the absence of a specific request by defendant for a clarifying modification or additional instruction. The second prayer, defining "malice" as improper and indirect motives "other than the mere purpose of vindicating public justice" includes too much—or excludes too little. Defendant's privilege, and his legitimate purpose, was not "merely" (if at all) to "vindicate public justice," but to defend himself by denying or mitigating his own moral or political responsibility for conditions in his office disclosed by the grand jury report and showing what he was doing to correct such conditions.

In a case such as this we should be reluctant to reverse a judgment for error in the form of a prayer. In the absence of a connected oral charge, it seems well nigh impossible that six or eight separate, largely abstract, written instructions on malice, punitive damages, fair comment and justification could be intelligible to a jury or could serve any useful purpose except to the extent, if any, that they might prevent, or give the court a basis for preventing, improper arguments before the jury.

> *Judgment reversed, with costs and new trial awarded.*