Heinz PULVERMANN

v.

A. S. ABELL COMPANY.
Lawrence WESTBROOK

v.

A. S. ABELL COMPANY.

Civ. Nos. 6967, 6968.

United States District Court
D. Maryland.

May 2, 1955.

618

Hal C. B. Clagett, Upper Marlboro, Md., and Warren E. Magee, Washington, D. C., for plaintiffs.

Venable, Baetjer & Howard, J. Crossan Cooper, Jr., and Francis D. Murnaghan, Jr., Baltimore, Md., for defendant.

COLEMAN, Chief Judge.

These are two libel suits, both against the same defendant, the A. S. Abell Company, a Maryland corporation, publishers of the Baltimore Sun, one suit by Lawrence Westbrook, a citizen of the State of Arkansas, and the other by Heinz Pulvermann, a citizen of the State of New York. There are the necessary allegations in each complaint as to the amount in controversy which, with the diversity of citizenship of the opposing parties, satisfy the jurisdictional prerequisites.

Both suits are before the Court on motions of the defendant for summary judgment, with supporting affidavits. The alleged basis for these motions is that there is no genuine issue as to any material fact respecting the publication by the defendant of the newspaper article on which both complaints are based; that the facts, as admitted by the plaintiffs, establish that the circumstances surrounding the publication render it privileged; and that the publication was made without malice.

The two complaints are virtually identical. Count 1 of each complaint alleges publication by the defendant on the morning of October 31, 1952, of a certain article in the Sun to be libelous per se. Count 2 of each complaint incorporates by reference the allegations of count 1, and alleges the publication of this article to be libelous when read in connection with the allegations of count 1. Under count 2 special damages are claimed, based on the innuendo ascribed to plaintiffs' contractual relations, each with the other, and the retarding or preventing of the reinstatement of a certain contract between the Companhia Atlantica, of Portugal, and the United States Government, in which each plaintiff had a 2½ per cent commission interest or fee of approximately $200,000. Plaintiffs ask for a judgment in each case in the sum of $500,000. The article, in full, is as follows:

"Larson Asks Metal Deal Probe, Says He Was Unaware Of Fee

"Revenue Chief Dunlap Ignores Subpoena ............. Page 4

"Washington, Oct. 30 (AO)—Jess Larson, chief buyer of critical materials for the Government, said today someone under his supervision failed to notify him that a $9,000,000 tungsten contract called for a fee to Col. Lawrence Westbrook, fired last night as a Democratic National Committee official.

"Larson said thus far he has found no evidence of 'wrongdoing or influence' in his agencies in connection with the contract. But he said he has ordered a 'full-scale top to bottom investigation.' Will publicly disclose all findings and, if there is evidence of wrong-doing, will refer it to the Justice Department.

"Denies Political Influence

"Westbrook was dismissed by Stephen A. Mitchell, Democratic national chair-

man, shortly after the New York Herald-Tribune published a copyrighted story terming the case 'the biggest five per-center deal ever exposed in Washington.'

"In Dallas, Westbrook denied today that he had used or attempted to use his Democratic National Committee position to influence the awarding of the contract.

" 'My services to the company were not in any manner of the so-called "five per center" variety.' Westbrook said in a written statement issued today from his room at the Adolphus Hotel.

"He refused comment beyond that included in his statement and would not answer reporters' questions.

### "Westbrook's Statement

" 'At the time I joined the national committee, all essential details of the company's contract had already been agreed to by the Federal Government,' Westbrook's statement said.

"He added: 'However, I realize that under the pressure of the final week of the campaign, Mr. Mitchell's responsibilities may have compelled him to take action without the opportunity of thoroughly checking the facts'.

"Westbrook said, 'The most distressing aspect of the whole matter so far as I am concerned is the feeling that misrepresentation of my position might result in injury to the cause of the Democratic party.'

"He said he was withdrawing from the campaign in Texas, where he has been helping Sam Rayburn, Speaker of the House, on behalf of Adlai Stevenson.

"Larson said he personally will head an investigation to determine whether there was any fraudulent conduct or wrongdoing, or any evidence of the use of influence.

### "Heads Both Agencies

"At present, he said, 'I know of no wrongdoing and have no knowledge of influence having been exercised on any member of any of the organizations which I head.'

"Larson said one thing he wants cleared up is why he was not given an unsigned letter-contract dated August 22, 1951, which disclosed that the tungsten deal involved a 5 per cent fee to Westbrook and another man, Heinz Pulvermann, of Rye, N. Y.

"The fee plan had been disclosed in a letter to the Emergency Procurement Service, but was not forwarded along with other papers in the case when that type of federal buying was taken over by the Defense Materials Procurement Agency, Larson said. He heads both agencies.

### "Larson Signed Contract

" 'If I find that someone in this agency deliberately detached the letter', Larson said, 'I will dismiss him from public service and try to find out what his motive was.'

"Larson signed the contract, as head of the Defense Materials Agency, and Westbrook signed on behalf of a Portuguese company which agreed to supply the Government with tungsten, a metal vital in the production of steel.

"Larson said the missing letter telling of the fee arrangement was replaced later on by a new letter, dated February 29 of this year. Larson said he did not know of it at the time he signed the contract and did not know any fee was involved until a Herald Tribune reporter told him so yesterday.

"Had he known any fee was involved, he said, he would not have signed the contract.

"Meanwhile, the contract had already been canceled before any deliveries were made. The contract, Larson said, called for initial deliveries at $57 a ton, but the market price has since dropped to about $55.

### "Contract Violation Charged

"Larson said he had learned that the company for which Westbrook acted was undertaking to buy tungsten at the lower figure and sell it to the Government at

the higher price provided in the contract. He said this violated a contract provision that the company was to provide tungsten from mines it controlled.

"Gen. Dwight D. Eisenhower, in a speech in New York City today referred to the case as the 'sort of crookedness (that) goes on and on in Washington.' Of Westbrook, he said, 'they had to fire him because someone caught up with him.'

"Westbrook could not be reached after a telephone conversation with the Herald Tribune, in which he said he had done nothing wrong. In his statement last night, Mitchell said 'there is no information before me that Colonel Westbrook sought to bring improper influence to bear on any agency or to make improper use of his position with the Democratic National Committee.'

"But Mitchell said he dismissed Westbrook because 'I do not think any exception can be made to the policy that an employee of the committee must not engage in business with the Government.'

"Westbrook, a former army man who is a research and development engineer, has been acting since last January 5 as a liaison man between the Democratic committee and members of Congress. More recently he has been working on the Texas State campaign for the Democratic national ticket.

"Sam Rayburn, Speaker of the House, in charge of that campaign, said in Dallas that Westbrook's dismissal has 'no bearing on the campaign in Texas.'

"Whatever Colonel Westbrook's other activities may be they have no bearing on the campaign in Texas,' Rayburn said. 'Our campaign is a fight against the efforts of the Republicans and their oil-rich friends in Texas to take over our State and bring a halt to the economic progress that has been made during the past twenty years.

" 'Regardless of other political developments, actual and contrived, I firmly believe we will be successful next Tuesday in resisting those efforts.'

"Directing Texas Drive

"Rayburn has been directing the drive to hold Texas in the Democratic column despite the switch to Eisenhower by Gov. Allan Shivers and the bulk of the State Democratic organization.

"The contract between the Government and the company for which Westbrook signed took effect September 11. It was canceled on Monday. The announced reason was that the company, Companhia Atlantica, had violated contract terms by going into the open market for tungsten to sell to the United States instead of keeping a pledge to supply the metal from mines it claimed to control.

"Larson said that even if it had not been canceled on that ground, 'we may have canceled the contract anyway had we known' that a Democratic committee aide was connected with it."

The contention of each plaintiff is based primarily upon (1) characterization of him as a "five percenter" in his connection with the Government contract referred to in the article; and (2) a reference in the article to a speech in New York City by the President,—then General and candidate for the Presidency, —Dwight D. Eisenhower, in which he referred to the contract under which the plaintiffs were to get a five per cent fee as "the sort of crookedness that goes on and on in Washington". In other words, plaintiffs object to the characterization of them as being crooked, plaintiff Westbrook being referred to in a further quotation from General Eisenhower's speech appearing in the Sun article, as follows: "They had to fire him because someone caught up with him".

Following this Court's refusal after full hearing to grant a motion to dismiss the complaint, filed by defendant in each case on the then state of the pleadings, i. e., before any answer had been filed, the defendant filed an answer in each case denying that the article complained of was libelous, asserting that it represented fair comment upon a matter of national importance and significance; that the defendant was privileged to pub-

lish it; and that such publication was made without malice.

The defendant thereafter filed a request directed to the plaintiffs for admissions, under Rule 36(a) of the Federal Rules of Civil Procedure, 28 U.S.C.A., of certain facts; and upon failure of the plaintiffs, after due service, to answer this request for admissions within the time required by Court order,—although the time had been extended, defendant consenting, from October 12, 1954, to November 8, 1954,—defendant filed on December 9, 1954, a motion for summary judgment in both cases, with affidavits in support thereof. Thereafter, on February 9, 1955, plaintiffs filed answers to defendant's request for admissions. The defendant thereupon filed in each suit a motion to strike these answers on the ground that since plaintiffs failed to answer defendant's request for admission of facts within the time required, such facts, under Rule 36(a) are, by the express language of the Rule, deemed to be admitted as true. Batson v. Porter, 4 Cir., 154 F.2d 566; Gilbert v. General Motors Corporation, 2 Cir., 133 F.2d 997; Adventures in Good Eating v. Best Places to Eat, 7 Cir., 131 F.2d 809. The Court, after argument of counsel, ruled in favor of the defendant on this contention and ordered plaintiffs' answers struck from the proceedings. On this state of the pleadings, the Court then proceeded to hear the motions of defendant for summary judgment, the basis of which, as already stated herein, being (1) that there is no genuine issue as to any material fact relative to the publication by the defendant of the newspaper article on which both complaints are based; (2) that the facts as admitted by the plaintiffs establish that the circumstances surrounding the publication render it privileged; and (3) that it was made without malice.

 Under the law of Maryland, which governs in these suits, "any unprivileged, false and malicious publication, which by printing, writing, signs or pictures tends to expose a person to public scorn, hatred, contempt, or ridicule, constitutes an actionable libel". If, however, the facts set forth in such publication are true, this is a complete defense. Bowie v. Evening News, 148 Md. 569, 574, 129 A. 797, 799. See also Stannard v. Wilcox & Gibbs Sewing Mach. Co., 118 Md. 151, 84 A. 335, 42 L.R.A., N.S., 515; Weeks v. News Publishing Co., 117 Md. 126, 83 A. 162; Goldsborough v. Orem & Johnson, 103 Md. 671, 64 A. 36; Kilgour v. Evening Star Newspaper Co., 96 Md. 16, 53 A. 716; Shepherd v. Baer, 96 Md. 152, 53 A. 790. In the present suit the defendant has not pleaded the truth of the alleged defamatory statements concerning plaintiffs in the article in question, but has taken the position that whether such statements be true or false, the publication of them was privileged, and therefore that such publication is not actionable. We thus are not required to, and do not decide, whether these statements are defamatory.

Plaintiffs assert that the motions for summary judgment should not be granted because, as they claim, there is a material issue of facts to be decided, which can only be decided after trial, with opportunity given to them to present to a jury any testimony that may be pertinent to the issue of malice. Plaintiffs admit that a newspaper may have a qualified privilege to publish libelous statements, but maintain that such qualified privilege has been abused by defendant in that (1) the defendant published the article after plaintiff Westbrook had stated that he did not want any publicity on the whole thing; (2) that repetition in the article as published of what General Eisenhower had said was not an accurate publication, namely, that it was not literally the same as the article that was received by the defendant from the Associated Press; and (3) that since the Sun favored General Eisenhower's election, it abused the privilege which it might otherwise have had in reporting news in support of the latter's election by "making balloons out of the plaintiffs", as counsel for plaintiffs characterize the effect of the article.

 It is true that a motion for summary judgment admits the truth of the allegations in the complaint, provided there is nothing in any other pleading

or admission that refutes the facts or truth of any allegation. Since, as already pointed out, the defendant does not deny that the statements contained in the published article, particularly the two statements which we have heretofore quoted, may be defamatory, their publication raises a prima facie presumption of what is known in the law as implied or legal malice, and ordinarily no other proof of malice is required than proof of the publication of the defamatory words themselves. However, if the occasion of the publication is such that the law affords a privilege to publish it, this prima facie presumption is repelled, and actual or express malice, as distinguished from implied or legal malice, must be proved. Evening News Co. v. Bowie, 154 Md. 604, 141 A. 416; Bavington v. Robinson, 124 Md. 85, 91 A. 777; Fresh v. Cutter, 73 Md. 87, 20 A. 774, 10 L.R.A. 67. Therefore, it becomes necessary to determine the precise character and extent of the privilege to publish which the law affords to the defendant, and then to apply that law to the facts as disclosed by the pleadings in the present case.

Until about the end of the 18th Century it was the law of England, from which we inherit our law of libel, that one who repeats defamatory statements was liable equally with the originator of them. However, public interest required departure from this rule under certain circumstances, as for example, repetition of court proceedings. See Curry v. Walter (1796) 1 B. & P. 525, and cases cited. Also, Rex v. Wright, 8 T. R. 293; Davison v. Duncan, 7 E. & B. 229. The exception was later extended to publication of Parliamentary proceedings, even though they contained defamation. Wason v. Walter (1868) L.R. 4 I.B. 73. And likewise to publication of proceedings of Governmental administrative bodies, Perera v. Peiris, [1949] A.C. 1. Commencing in 1877, we find decisions of the Maryland Court of Appeals following the English rule to the extent that this qualified privilege was extended to judicial proceedings. McBee v. Fulton, 47 Md. 403. See also Bowie v. Evening News, supra; Bowie v. Evening News Co., 151 Md. 285, 134 A. 214; Evening News v. Bowie, supra.

It is clear that this principle which has been evolved over the years in our law is very definitely a qualified privilege, and only exists if the defamatory statements are of such public interest as to justify their repetition, and if such repetition is fair and bona fide, and accurate. This qualified privilege has been extended in England in favor not only of a candidate for public office and the press that reports what he says as such candidate, as respects his statements made against an opposing candidate for such office, but likewise with respect to statements made by him against a supporter of an opposing candidate. Braddock v. Bevins, [1948] 1 K.B. 580. Such a situation is akin to that in the present case, because plaintiff Westbrook was an active supporter of Governor Stevenson, who was General Eisenhower's opponent for the Presidency.

While there is no reported Maryland decision involving a state of facts parallel with those presented in the present case, we find nothing in any of the decisions of the Maryland Court of Appeals which in any way indicates that this qualified privilege, when shown to be justified in the public interest, should not be extended to a situation such as the one now before us. Closely related to this qualified privilege of repetition of statements of actual public interest and importance is the privilege of fair comment on matters of actual public interest and importance. What is said in the press in connection with the repetition of statements must always be read in its entirety in order to determine whether it does constitute fair comment. See especially Foley v. Hoffman, 188 Md. 273, 52 A.2d 476, which involved a libel suit brought by the Chief Clerk to the Treasurer of Baltimore County against the Treasurer, by whom he had been removed from office for inefficiency and neglect. In his complaint the chief clerk alleged that the Treasurer had falsely and maliciously caused the Baltimore Sun to publish a grand jury report of inefficiency in the Treasurer's office, which

contained among its recommendations one for a new and different type of chief clerk. The complaint also alleged that the Treasurer had similarly caused the Sun to publish his comments on the grand jury's report, all of which were "false, scandalous, malicious, injurious, libelous, damaging, and defamatory of and concerning the plaintiff as a clerk and public servant." The appellate court reversed a judgment for the chief clerk in the lower court, and awarded a new trial because of the error, among others, held to have occurred in the lower court, of excluding as evidence the grand jury report and the newspaper account accompanying it.

Since the law of Maryland governs in the present case, it is deemed unnecessary to do more than refer to some of the many decisions of other State Courts which fully support the principles upon which we here rely. See Flanagan v. Nicholson Publishing Co., 137 La. 588, 68 So. 964, L.R.A.1917E, 510; Emde v. San Joaquin County Central Labor Council, 23 Cal.2d 146, 143 P.2d 20, 150 A.L.R. 916; Williams v. Standard Examiner Pub. Co., 83 Utah 31, 27 P.2d 1; Bereman v. Power Publishing Co., 93 Colo. 581, 27 P.2d 749, 92 A.L.R. 1024; McClure v. Review Publishing Co., 38 Wash. 160, 80 P. 303; Begley v. Louisville Times Co., 272 Ky. 805, 115 S.W.2d 345, 346. See also Restatement of the Law of Torts, Secs. 606 and 611.

Freedom of the press is a constitutional guaranty. Yet this guaranty does not give immunity to the press from liability for libelous statements, but merely secures to the press the same basic rights and immunities as are enjoyed by the public at large. Thus the general rule is well established, independently of statute, that a newspaper has no more right than a private individual to injure any person's reputation or business maliciously or through carelessness or recklessness, without answering therefor in damages. Libels are actionable because the right of every individual to personal security is deemed to embrace the right to be free from malicious publications which are designed to give publicity to a charge or an imputation injuring one's reputation. Thus, malice, either actual or imputed, becomes the gist of every actionable libel. But the law implies malice and damage when false and defamatory statements are published without justification.

Under the pleadings in the present case the following facts are uncontradicted; most of them are embraced in the defendant's request for admission of facts; the truth of all of the facts embraced in this request, the plaintiffs, as already explained, are held to have admitted through their failure seasonably to deny them, and obviously all of them that are really material to the issues raised by the motions for summary judgment cannot be other than true in the sense that they are matters of public record: that plaintiff Westbrook served as a member and assistant chairman of the Democratic National Committee from January 7, 1952 to October 29, 1952; that for some time prior thereto he had been a research engineer, and that both prior and subsequent to January 7, 1952, he and the other plaintiff, Heinz Pulvermann, had represented Companhia Atlantica, commonly referred to as Atlantica, a Portuguese corporation, in its efforts to secure a contract for sale to the United States Government of Wolfanite or Tungsten produced by Portuguese mines; that, as a result, a contract between the United States Government and Atlantica was entered into on September 11, 1952; that at this time and until the Presidential election in 1952, General Dwight D. Eisenhower was the candidate of the Republican party, and Governor Adlai E. Stevenson the candidate of the Democratic party; that during the campaign the plaintiff Westbrook, as a member of the Democratic National Committee, was actively engaged in the support of the candidacy of Governor Stevenson; that on October 29, 1952, plaintiff Westbrook was dismissed by the then Chairman of the Democratic National Committee, Stephen A. Mitchell, from his position with this committee, on the ground that no ex-

ception would be made in his case to the Committee's policy that an employee of the Committee must not engage in business with the United States Government; that Jess Larson, who signed the contract of September 11, 1952, on behalf of the United States with Atlantica, above referred to, was at that time Administrator of the Defense Material Procurement Agency, as well as Administrator of the Emergency Procurement Service Agency of the Government, and continued to hold such offices through October 31, 1952; that on October 27, 1952, Jess Larson, on behalf of the United States Government, canceled and terminated this contract on the ground that, contrary to the terms of the contract, Atlantica was undertaking to buy Tüngsten at a lower figure than that at which it had contracted to sell to the Government; that plaintiff Westbrook, on October 29, 1952, told a reporter for the New York Herald-Tribune that there was nothing wrong about his connection with the Atlantica contract, and that he did not want any publicity on the whole thing at that time; that on October 30, 1952, he issued another statement to the same effect to the press in Dallas, Texas, except that he placed no restriction on the publication of this second statement, as he did on the first, and he issued the additional statement, among others, that since misrepresentation of his position might result in injury to the cause of the Democratic party, he was withdrawing from the political campaign in Texas.

It further appears from the uncontradicted affidavits of both the managing and the assistant managing editor of the Baltimore Sun that they alone had authority to determine whether a news dispatch from the Associated Press should be published in the Sun; and that while they had no independent recollection of the circumstances concerning the decision to include the article here in issue in the Baltimore Sun of October 31, 1952, one or the other of them must have made the decision to include it; that both the managing editor and the assistant managing editor, before the publication of the article here in issue, were entirely unacquainted with both plaintiffs in this suit, either personally or by reputation, and still are so entirely unacquainted; that no instructions had been received by them from any of their superiors to publish stories in the Baltimore Sun because of their superiors being either favorable or opposed to the Democratic or Republican party or their respective candidates for President in the 1952 campaign; that throughout the 1952 campaign for the Presidency, both the managing editor and the assistant managing editor of the Sun were supporters of the candidacy of the Democratic candidate Stevenson; that as duly qualified and registered voters they voted for him, and that neither of them has had, either prior or subsequent to the publication in the Baltimore Sun of the article here in issue, any ill will or malice toward either of the plaintiffs in the present suits.

Plaintiffs maintain that in spite of the aforegoing uncontradicted facts there still remains in the case an issue of malice, for three reasons: (1) that the article was published after plaintiff Westbrook had warned the New York Herald-Tribune and the Associated Press not to publish it, and that this knowledge is to be imputed to the Baltimore Sun; (2) that malice is to be implied because the Baltimore Sun favored General Eisenhower's election and, therefore, the inference is that the publication was maliciously made; and (3) that there is no proof on the pleadings as they now stand that the article in question was in fact published in substantially the same form it was when received by the Baltimore Sun from the Associated Press.

The Court finds no real substance in any of these three contentions. As to the first one, namely, that the defendant published the article in the face of plaintiff Westbrook's warning not to publish it, the uncontradicted fact is that plaintiff Westbrook issued two statements, one on October 29th and one on the 30th. In the first one he said he did not want his statement given publicity, but when he gave the second statement, no such restriction

was imposed. In the published article here in issue no reference is made to the first statement, but only to the second.

The decision of the Maryland Court of Appeals in Domchick v. Greenbelt Consumer Services, 200 Md. 36, 87 A.2d 831, is not believed to be contrary to the conclusion here reached that we are fully justified in granting the motions for summary judgment. In that case, on facts distinctly different from those before us, and therefore it seems unnecessary to state them, the Court held that the state of the evidence was not such at the close of the plaintiff's case to rebut a presumption of malice but stated, 87 A.2d 831, at page 837: "This presumption of malice is rebutted where the plaintiff's own evidence shows that the publication was privileged, and, therefore, in such a case, no testimony is required from defendants, and the case can be taken from the jury at the conclusion of the plaintiff's case." In the present case, on the face of the pleadings and plaintiffs' own admissions, nothing further is required from the defendant to prove that what it published was privileged and without malice. Such cases as Spanel v. Pegler, 7 Cir., 160 F.2d 619, and Christopher v. American News Co., 7 Cir., 171 F.2d 275, are also not in point. They involved attempts to dismiss, by motion, complaints for libel before there had been, contrary to the present situation, answers filed and admissions by plaintiffs which result in leaving no material question in dispute. The same situation as presented in the present cases appears to have been involved in the case of Joe Abram v. Brailey Odham and the Florida Publishing Co., (unreported), a very recent decision of the Circuit Court, Fourth Judicial Circuit, of the State of Florida, and there the complaint was dismissed on motion.

As to plaintiffs' second point, namely, that malice is to be implied because of the fact that the Baltimore Sun favored the election of General Eisenhower, we believe that this inference has no foundation in fact, in view of the uncontradicted sworn statements of the two persons, the managing editor and the assistant managing editor of the Sun, who alone had consideration of the article before it was published; who had made the decision that it should be published, and who were totally unacquainted with the plaintiffs in the present case.

Lastly, as to the plaintiffs' third point, namely, that proof is lacking that the article was published in substantially the same form as when received from the Associated Press, suffice it to say that one of the admissions in the case is that it was so published; and there is nothing on this point which can reasonably be considered as indicating that there is any substantial question of fact involved in it.

With respect to plaintiff Pulvermann, it is to be noted that he is referred to only once in the entire article, as follows: "Larson said one thing he wants cleared up is why he was not given an unsigned letter-contract, dated August 22, 1951 which disclosed that the tungsten deal involved a 5 per cent fee to Westbrook and another man, Heinz Pulvermann, of Rye, N. Y."

On behalf of plaintiff Pulvermann it is contended that because in the article General Eisenhower is quoted as having referred to the case as "the sort of crookedness that goes on and on in Washington", the article as a whole must therefore be treated as relating to both Pulvermann and Westbrook, insofar as alleged defamation of character by reference to five percenters and crookedness is concerned.

■ In the light of the aforegoing uncontradicted facts as disclosed on the pleadings as they now stand, we are satisfied that the defendant did not abuse the qualified privilege that it had when it printed, as it did, the article in question, even though it be assumed,—which we are not called upon to decide and, as has already been stated, do not decide,—that the characterization of one or both of the plaintiffs as "five percenters" or "crooked" was in fact libelous. Defendant repeated correctly, with no material change in the text, the article as received by it

from the Associated Press. Summarized, what this article itself contains was what high Government officials and other persons prominent in the conduct of public affairs had said concerning a matter of large public importance during a period shortly before an occurrence of great public concern, namely, an election for the Presidency. We find that qualified privilege, as we have heretofore defined it, has not been abused by this publication. Gandia v. Pettingill, 222 U.S. 452, 32 S.Ct. 127, 56 L.Ed. 267.

With respect to the further contention that there has been abuse of the related qualified privilege of fair comment upon an article of this kind, we likewise find nothing that was printed in the Sun that substantiates this contention. There is no comment or paraphrasing that can, on any reasonable ground, we believe, be said to constitute abuse of the privilege of re-publication and fair comment.

For these reasons, the motions for summary judgment are granted in both cases.