HAL BARRY KOREN, INFANT, ETC., ET AL. *v.* CAPITAL-
GAZETTE NEWSPAPERS, INC. ET AL.

[No. 727, September Term, 1973.]

*Decided September 17, 1974.*

The cause was argued before MOYLAN, GILBERT and LOWE,
JJ.

*Benjamin Lipsitz*, with whom was *Eleanor J. Lipsitz* on the brief, for appellants.

*James E. Wesner*, with whom was *Albert J. Goodman* on the brief, for appellees.

MOYLAN, J., delivered the opinion of the Court.

The appellants, Hal Barry Koren, a minor, and his parents (hereinafter "the Korens"), appeal from an order of Judge George Sachse in the Circuit Court for Anne Arundel County granting a motion for summary judgment in favor of the appellees, Capital-Gazette Newspapers, Inc., publisher of *The Evening Capital*, an Annapolis newspaper, and one of its reporters (hereinafter, together, called "Capital"). The Korens had brought a libel action against Capital for publishing an allegedly false and malicious statement about Hal Barry Koren, describing his arrest by federal authorities on an extortion charge.

In concluding that Judge Sachse was correct, we do not reach a series of intriguing constitutional issues raised by *New York Times v. Sullivan*, 376 U. S. 254, 84 S. Ct. 710, 11 L.Ed.2d 686 (1964); *Curtis Publishing Co. v. Butts*, 388 U. S. 130, 87 S. Ct. 1975, 18 L.Ed.2d 1094 (1967); *Rosenbloom v. Metromedia*, 403 U. S. 29, 91 S. Ct. 1811, 29 L.Ed.2d 296 (1971), and, most recently and revolutionarily, *Gertz v. Welch*, 42 L. W. 5123 (decided June 25, 1974). A broad range of First Amendment considerations is foreclosed by our more pedestrian conclusion that the Korens did not cross the threshold of establishing a defamatory statement in the first instance.

On October 10, 1972, the following article appeared in *The Evening Capital*:

"EXTORTION HEARING SET TODAY"

"By PETER RUEHL
Staff Writer"

(1) "Hal Barry Koren, the 17-year-old youth, arrested early Saturday and charged with

extortion, was scheduled to appear before a U.S. magistrate today in Baltimore for a preliminary hearing.

(2) "The youth was released yesterday on $15,000 bail. His father, court sources said, had to pay 10 percent bail bond — $1,500 — to get young Koren out of jail.

(3) "Koren lives at 1520 Gordon Grove Drive, Annapolis.

(4) "The Annapolis Senior High School student was arrested Saturday in Annapolis by FBI agents from the Baltimore office. He was charged with attempting to extort $20,000 from the Safeway Store in the Eastport Shopping Center.

(5) "The store manager, Wilbur Dove, said he received a lengthy letter demanding the money and threatening to place a bomb in the store if the money were not received.

(6) "The letter ordered the money to be delivered near the intersection of Bay Ridge and Arundel-on-the-Bay Roads and specified that the currency should be in $50 and $100 bills. The site would be marked by a white sheet on the left side of the road the letter said. The pick-up was scheduled for 9 p.m. Friday.

(7) "FBI agents set up roadblocks in the vicinity but Baltimore Special Agent in Charge Thomas H. Farrow declined to say when and where the actual arrest took place.

(8) "Farrow said the bureau would not give out the information prior to Koren's trial because of the gravity of the federal crime and because the accused is a juvenile.

(9) " 'On the federal level, we restrict what we give out,' Farrow said. He added he didn't want to divulge the FBI's methods in apprehending the suspect because it could result

in someone else trying the same thing and avoiding being caught.

(10) " 'The only thing that could happen if we gave the information out would be for someone to want to improve upon his (Koren's) method,' Farrow said.

(11) "The preliminary hearing today was preceded by an arraignment Saturday in U.S. District Court in Baltimore.

(12) "If tried as an adult and convicted, Koren would face a maximum sentence of 20 years and a minimum of five years.

(13) "It is not know (sic) whether the FBI delivered the money or a decoy to the rendezvous site Friday night, but Safeway Stores officials said they didn't participate in the arrest after alerting federal officials.

(14) "Dove, the store manager, quoted the letter as saying if the money were not received, the letter would sent (sic) to The Evening Capital for publication." [1]

On April 26, 1973, the Korens sued Capital for libel, alleging that the article was false, malicious and libelous *per se*.[2] They claimed $25,000 in compensatory damages [3] and $250,000 in punitive damages.[4]

---

**1.** The paragraphs of the article as set out above are numbered to facilitate reference to them. Judge Sachse, in his opinion, referred to the paragraphs of the article by such numerical designations. The paragraphs, of course, were not numbered in the published article.

**2.** The continuing utility of the notion of libel *per se* is very much in doubt in the wake of *Gertz v. Welch, supra.* The Supreme Court made it clear that absolute liability even for defamatory falsehood cannot withstand First Amendment scrutiny. Fault, of varying degrees in varying situations, may never, as at the common law, be presumed from the character of the defamatory statement but must be independently proved.

**3.** *Gertz v. Welch, supra,* made clear that, absent a showing of "constitutional malice" as construed in *New York Times v. Sullivan, supra,* there could be a recovery only for actual damages affirmatively established. General damages to reputation may not, as at common law, be presumed from the character of the defamatory statement.

**4.** *Gertz v. Welch, supra,* also definitely established that there may never be punitive damages, absent the establishment of "constitutional malice."

In support of its motion for summary judgment, Capital submitted a copy of the Record of Proceedings before the United States Magistrate for the District of Maryland, describing the circumstances of young Koren's arrest, and the affidavits of three Capital employees: Peter Ruehl, the reporter who prepared the article at issue; James Camenga, another reporter who had prepared an earlier article on the same subject; and Joseph A. Panella, Jr., an editor who supervised the work of Ruehl and Camenga. In support of their answer to the motion, the Korens filed an affidavit of Thomas H. Farrow, the FBI agent who had been interviewed by Ruehl in the course of Ruehl's preparation of the article. Capital then filed a second affidavit supplementing Ruehl's earlier affidavit. Also available was the filed deposition of Camenga.

The focus of the case narrowed down to a very fine point; indeed, ultimately to a single word. The FBI was investigating a serious extortion, a threat to place a bomb in a large retail store if $20,000 were not turned over to the extortionist. The FBI set a trap. Young Koren, by a set of bizarre and unforeseen circumstances, apparently chanced into the trap. Although probable cause apparently existed for the FBI to arrest him and to charge him, subsequent investigation revealed his lack of guilt and charges against him were dropped.

The affidavits of Ruehl and Camenga, uncontested in this regard, established that neither reporter knew any of the Korens nor had any reason or desire to harm them in any way. Camenga wrote an initial article, not here in question, on October 9, 1972. He telephoned the Baltimore office of the FBI and learned therefrom that Hal Barry Koren, a seventeen-year-old Annapolis student, had been arrested by the FBI on October 6th and charged with extortion. Camenga also was told by the FBI that young Koren had been arraigned. Camenga also interviewed the threatened store manager and learned the details of the threat.

Ruehl was responsible for a follow-up article on October 10th. He relied for background upon Camenga's article of October 9th. That background constituted paragraphs 1, 4, 5,

6, 7, 13 and 14 of the October 10th article. For follow-up, Ruehl called the FBI office in Baltimore and spoke with Special Agent Thomas Farrow. He learned from Agent Farrow the address of Koren; the fact that Koren had been released on bail following a preliminary hearing; and the fact that Koren, if tried as an adult and convicted, would face a maximum sentence of 20 years and a minimum sentence of 5 years. This information, all factually correct, provided the basis for paragraphs 2, 3, 11 and 12 of the October 10th article. Ruehl sought to elicit further information relating to the circumstances of Koren's arrest. Agent Farrow declined to provide such information, giving as his reasons the statements which appear in paragraphs 8, 9 and 10 of the October 10th article.

Initially, there is no question but that truth is an absolute shield for Capital in reporting accurately newsworthy events, even when the object of the coverage is a "private individual" as opposed to a "public official" or "public figure." *Time, Inc. v. Hill,* 385 U. S. 374, 87 S. Ct. 534, 17 L.Ed.2d 456 (1967).[5] Even if the underlying arrest or the underlying criminal charges turn out to be ill-founded, it is well settled that in Maryland a newspaper enjoys a qualified privilege to publish reports of arrests and charges on which arrests are made, as well as other matters involving violation of the law. *Evening News Co. v. Bowie,* 154 Md. 604, 141 A. 416 (1928); *Piracci v. Hearst Corp.,* 263 F. Supp. 511 (D. Md. 1966) (construing Maryland law). This privilege is lost only when it can be shown that the defendant abused the privilege by publishing the defamatory statement (the charges that turn out to be ill-founded) with "actual malice" (in the common law sense connoting hatred or ill will, as opposed to "constitutional malice" in the *New York Times v. Sullivan* sense connoting "knowing or reckless falsity").

---

[5]. *Time, Inc. v. Hill* dealt literally with invasion of privacy and not with defamation, but First Amendment limitations on state tort law are not dissimilar in the two situations. *Time, Inc. v. Hill* went further and held that, in invasion of privacy cases, even inadvertent or negligent falsehood will not give rise to liability if the "content [would] not warn a reasonably prudent editor or broadcaster of its defamatory potential." *Gertz v. Welch, supra,* at 42 L. W. 5131.

*Evening News v. Bowie, supra; Piracci v. Hearst Corp.,
supra.* The burden of proving such malice is on the plaintiff.
*Domchick v. Greenbelt Consumer Services, Inc.,* 200 Md. 36,
87 A. 2d 831 (1952); *Stevenson v. Baltimore Baseball Club,
Inc.,* 250 Md. 482, 243 A. 2d 533 (1968); *Simon v. Robinson,*
221 Md. 200, 154 A. 2d 911 (1959); *Deckelman v. Lake,* 149
Md. 533, 131 A. 762 (1926). Cf. *A. S. Abell Co. v. Barnes,* 258
Md. 56, 265 A. 2d 207 (1970).

With actual malice or ill will in the common law sense not
remotely suggested, the Korens are bereft of even an
arguable case with respect to paragraphs one through nine
and eleven through fourteen. In reporting accurately what
was told to its reporters by the FBI and by the victim of the
crime, Capital was fully privileged. Even to begin to make a
case, the Korens must establish some falsity emanating not
from the FBI but from Capital directly. They, of necessity,
direct their fire exclusively at paragraph 10. We quote
paragraph 9 as well, in order to place paragraph 10 in
context:

> (9)  " 'On the federal level, we restrict what we
> give out,' Farrow said. He added he didn't want
> to divulge the FBI's methods in apprehend-
> ing the suspect because it could result in some-
> one else trying the same thing and avoiding
> being caught.
>
> (10)  " 'The only thing that could happen if we
> gave the information out would be for some-
> one to want to improve upon his *(Koren's)*
> method,' Farrow said." (Emphasis supplied.)

The case hinges upon the single word "Koren's" contained
in parentheses after the word "his." The Korens claim
initially that there is a genuine dispute over a material fact,
so as to defeat a motion for summary judgment and to
require a trial. They produced an affidavit from Agent
Farrow asserting:

> "That on or about October 9, 1972, I stated to
> Peter Ruehl, a reporter for the Annapolis Evening
> Capital, in substance, that one reason why the

Federal Bureau of Investigation did not release information concerning cases of extortion was that someone might thereby utilize or improve upon the method of the perpetrator or perpetrators of such crimes and, further, that in making the aforesaid statement *I did not identify by name or otherwise any perpetrator or perpetrators, alleged or otherwise, of any particular crimes.*" (Emphasis supplied.)

The Korens posit a "genuine dispute over a material fact" by juxtaposing the affidavit of Agent Farrow with the initial affidavit of Ruehl in which he stated that ". . . Agent Farrow declined to provide such information, giving as his reasons the statements which appear in paragraphs 8, 9 and 10 of the October 10, 1972, article."

The appellants' thesis is that Ruehl thereby swore that Farrow had uttered the word "Koren's", whereas Farrow swore that he had not. The slightest semblance of a factual dispute, genuine or strained, material or immaterial, is dissipated, however, by the supplemental affidavit of Ruehl in which he amplifies and explains that the "quoted matter appearing in Paragraph 10" was "to the best of his recollection and belief, a verbatim quotation . . . except for the word '(Koren's)'," and that "the word '(Koren's)' was inserted by him to explain the word 'his' which appears immediately before it." Capital, in short, acknowledges full authorship of the word "(Koren's)."

This is dispositive of the threshold question of whether a summary judgment may lie. A trial was simply not necessary to discover the source of the disputed word. Maryland Rule 610 d 1; *Salisbury Beauty Schools v. State Board*, 268 Md. 32, 41, 300 A. 2d 367, quoting with approval *Knisley v. Keller*, 11 Md. App. 269, 273 A. 2d 624.

The question now becomes that of what to make of the undisputed fact. The thesis of the Korens is that young Koren was defamed when Capital falsely attributed to the FBI the implication that Koren had committed a crime by falsely attributing to the FBI the reference to "Koren's

method." In our judgment, the thesis won't wash. A jury simply could not be permitted to base a finding of libel on so tenuous and speculative a reed. Initially, even the structure of the sentence belies the argument predicated upon it. The very use of the parentheses denotes a reporter's interpretation within the quoted material, parenthetically supplying an antecedent for an otherwise possibly ambiguous pronoun. If the proper noun were falsely being attributed to Agent Farrow, the quotation would have read "Koren's method," not "his (Koren's) method."

More significantly, however, the whole point is trivial — a grasping at a straw of one small and technically arguable grammatical error to defeat an otherwise unassailable privilege based upon a truthful reporting of official action. The indirect contribution of one word in a tenth paragraph to the implication that the FBI believed Koren involved in the extortion was absolutely *de minimis*. The first paragraph of the article recounted that Koren had been arrested and charged with extortion.

The second paragraph described how Koren was released only after posting a bail of $15,000. The strong implication is that both the charging agency (the FBI) and the United States Magistrate believed Koren to be involved in a very serious crime. The fourth paragraph refers directly to the Saturday arrest of Koren "by FBI agents from the Baltimore office" and their charging of him "with attempting to extort $20,000 from the Safeway Store in the Eastport Shopping Center." The implication therein is irresistible — "the FBI believed Koren to be the extortionist." The seventh paragraph described how the "FBI agents set up roadblocks in the vicinity" where the extortion money was to be delivered, all of this preceding the arrest of Koren. The eleventh paragraph reported the prior arraignment of Koren and his scheduled preliminary hearing — exercises that a person is not subjected to unless someone in responsible authority believes him to have perpetrated a crime. The very headline "EXTORTION HEARING SET TODAY" clearly implies official belief in Koren's criminal involvement. In short, no perplexed reader was still seeking subtle clues in

the tenth paragraph as to the position of the FBI in the case. They had arrested and charged Koren because they believed him guilty.

It is clear that where alleged libel derives from an innuendo, the court must consider the challenged words (or word) in the context of the whole article in which they appear. *Flaks v. Clarke,* 143 Md. 377, 122 A. 383 (1923). As was said in *Maas v. National Casualty Co.,* 97 F. 2d 247, at 249:

> "[S]ince the injurious character of the publication and the harm done to the plaintiff depends upon the manner in which the writing is understood by those to whom it is uttered, it must be read and construed in the sense in which the reader would ordinarily understand it. . ."

Looking at the article as a whole, we conclude that for an ordinary reader, no arguably subtle implication in the tenth paragraph would add one whit to the clear drift of the rest of the article, the privilege of which is beyond cavil.

Our holding that there was no defamation on the part of Capital in the first instance makes it unnecessary to consider the degree of fault that would impose liability. We would note, however, that the Maryland law in this regard is currently in a state of limbo.

*New York Times v. Sullivan, supra,* changed radically the common law of defamation when the plaintiff is a public official, limiting liability to cases of "constitutional malice," that is, "knowing or reckless falsity." See *A. S. Abell Co. v. Barnes, supra. Curtis Publishing Co. v. Butts, supra,* extended the First Amendment limitation to those cases where the plaintiff was, in more general terms, a "public figure." The plurality opinion in *Rosenbloom v. Metromedia, supra,* would have extended the *New York Times* doctrine to cases involving even private plaintiffs involved in newsworthy events. *Gertz v. Welch, supra,* has, however, definitely declined so to extend the rule of *New York Times* and has allowed the states "substantial latitude" in "defin[ing] for themselves the appropriate standard of

liability for a publisher or broadcaster of defamatory falsehood injurious to a private individual." 42 L. W. at 5130. It has absolutely precluded, however, the imposition of "liability without fault." Fault may no longer, as it was at the common law, be presumed from the very making of a statement libelous *per se*. Maryland's preexisting common law of presumptive fault is now unconstitutional. Maryland could, of course, opt for a stringent *New York Times* standard of "knowing or reckless falsity" even as to the defamation of newsworthy private persons. It could, on the other hand, opt for a lesser standard of negligence in failing to adhere to that standard of care prevailing in the journalistic profession. The latter would be, of the constitutionally permitted alternatives, the closest to our preexisting common law. The present case, however, is neither a necessary nor prudent vehicle for such decision.

*Judgment affirmed; costs to be paid by appellants.*