472 A.2d 1021
**Richard Gaines STEER**

v.

**LEXLEON, INC.**

**No. 435, Sept. Term, 1983.**

Court of Special Appeals of Maryland.

April 4, 1984.

**200**

George R. Sparling, Leonardtown, for appellant.

Theodore Sherbow, Baltimore, with whom were Henry R. Abrams and Weinberg & Green, Baltimore, on the brief, for appellee.

Argued before MOYLAN, BISHOP and ALPERT, JJ.

MOYLAN, Judge.

The appellant, Richard Gaines Steer, sued the appellee, Lexleon, Inc., in a two-count declaration, alleging 1) an invasion of privacy and 2) defamation. The appellee filed in the Circuit Court for St. Mary's County a Motion for Summary Judgment, supported by two affidavits, a deposition, and five exhibits. Judge Joseph A. Mattingly entered the summary judgment in favor of the appellee. This appeal timely followed.

The facts are not in dispute. Lexleon, Inc. is the publisher of *The Enterprise,* a newspaper published twice weekly in St. Mary's County. One of its regular features is entitled "Police Blotter." The regular procedure for the preparation of the weekly "Police Blotter" involved a reporter from *The Enterprise* going each Monday morning to the Leonardtown Barracks of the Maryland State Police. The reporter would there pick up from Desk Sergeant Charles E. Dammann, Jr., the Criminal Section Supervisor at the Leonardtown Barracks, the weekly Press Release.

Sergeant Dammann's duties were primarily administrative and supervisory. He reported directly to the Assistant Barracks Commander, Lieutenant James Plunkert. The preparation of the news release was one of Sergeant Dammann's official duties. In the course of that preparation, he would review all of the reports of criminal investigations for the preceding week and briefly list those which he deemed newsworthy.

The critical Press Release in this case was issued on August 24, 1981. It was typical of the weekly practice. In two typewritten pages, it briefly reported 17 arrests or reports of crime in St. Mary's County during the preceding week. The reports ranged in length from three typewritten lines to five typewritten lines, with four lines being the average. The weekly "Police Blotter" generally reiterated the State Police Press Release verbatim, with the single prominent exception that it grouped the various crime reports according to the county towns or sections in which they occurred. The third item in the Press Release of August 24, 1981 was:

"Richard Gaines Steer of Mechanicsville was arrested for forgery by Trooper Thomas Healy on 8/13/81. He attempted to cash a forged check at a local bank."

The "Police Blotter" that was published two days later, on Wednesday, August 26, 1981, listed that report of arrest as its twelfth item. It followed the Press Release verbatim, except that the news story amplified the date of arrest by

adding the word "Thursday" to the date "Aug. 13," and provided further with respect to the putative arrestee, "He was charged with attempting to cash. . ." rather than using the direct words of the Press Release, "He attempted to cash. . . ."

In fact, Richard Gaines Steer had not been arrested for forgery. He was rather the victim of the forgery. The Press Release had been wrong. Sergeant Dammann explained that as he organized his data for the preparation of the Press Release, he had for each summary of a crime report two boxes, one for the name of the victim and one for the name of the arrestee. On a hectic morning, interrupted by many telephone calls and other duties, he inadvertently put Mr. Steer's name in the wrong box. The error followed from that.

When the story appeared, Mr. Steer telephoned *The Enterprise* and spoke to the reporter in question. The reporter promptly contacted Sergeant Dammann and confirmed the fact that a mistake had been made in the Press Release. The next edition of *The Enterprise,* that of Friday, August 28, 1981, included a prominently placed correction. The correction was placed side-by-side with that day's version of the "Police Blotter" and under a large and bold, single column headline saying "Correction." The correction read:

"In the Wednesday, Aug. 26 issue of The Enterprise it was incorrectly reported that Richard Gaines Steer of Mechanicsville was arrested for forgery.

Steer was the victim of the forgery. Francis Xavier Woodland of Mechanicsville was arrested for attempting to forge Steer's signature on one of his checks.

Steer had been incorrectly listed on the Maryland State Police press release as the culprit.

The Enterprise and the Maryland State Police regret the error."

In support of its motion for summary judgment, the appellee filed the affidavits of its editor and its reporter and the deposition of Sergeant Dammann, who had prepared the

Press Release containing the report of Mr. Steer's arrest. Mr. Steer did not file any counter-affidavits or other evidence in opposition to Lexleon's motion. The affidavits included the undisputed assertions that neither the editor nor the reporter possessed any malice or ill will directed toward Mr. Steer.

The issue before the court below and before this Court on the present appeal is whether the appellee, under the circumstances of this case, enjoyed a qualified or conditional privilege. If it did, the law is now clear that the malice necessary to defeat the qualified privilege in a defamation case is "constitutional malice" within the contemplation of *New York Times Co. v. Sullivan,* 376 U.S. 254, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964). In two scholarly and painstaking analyses in *Jacron Sales Co. v. Sindorf,* 276 Md. 580, 350 A.2d 688 (1976), and *Marchesi v. Franchino,* 283 Md. 131, 387 A.2d 1129 (1978), Judge Levine brought the Maryland law on malice and qualified privileges into line with the Supreme Court's constitutional pronouncements in *New York Times Co. v. Sullivan, supra; Curtis Publishing Co. v. Butts,* 388 U.S. 130, 87 S.Ct. 1975, 18 L.Ed.2d 1094 (1967); *Rosenbloom v. Metromedia,* 403 U.S. 29, 91 S.Ct. 1811, 29 L.Ed.2d 296 (1971); and *Gertz v. Robert Welch, Inc.,* 418 U.S. 323, 94 S.Ct. 2997, 41 L.Ed.2d 789 (1974). In *Marchesi v. Franchino, supra,* at 283 Md. 139, 387 A.2d 1129, Judge Levine concluded the analysis with the controlling holding:

"We hold, therefore, that 'knowledge of falsity or reckless disregard for truth' is the standard by which the malice required to defeat the conditional privilege defense is to be measured in cases of private defamation. To the extent that our prior decisions are not in accord with this holding, they are disapproved."

The appellant concedes that there was no "constitutional malice" in this case. The only issue, therefore, is whether the appellee enjoyed a qualified privilege. In that regard, the Maryland law is also well settled that "the question of whether a defamatory communication enjoys a conditional

privilege is one of law for the court." *Jacron Sales Co. v. Sindorf, supra,* 276 Md. at 600, 350 A.2d 688; *Hanrahan v. Kelly,* 269 Md. 21, 29, 305 A.2d 151 (1973); *Jump v. Barnes,* 139 Md. 101, 112, 114 A. 734 (1921); *Bavington v. Robinson,* 124 Md. 85, 90, 91 A. 777 (1914); *Fresh v. Cutter,* 73 Md. 87, 93, 20 A. 774 (1890).

■ We have no difficulty in holding that the appellee enjoyed a qualified privilege. We find our decision in *Koren v. Capital-Gazette Newspapers, Inc.,* 22 Md.App. 576, 325 A.2d 140 (1974) to be controlling. In that case, the FBI was investigating a serious extortion, a threat to place a bomb in a large retail store if $20,000 were not turned over to the extortionist. The FBI set a trap. The young plaintiff, by a set of bizarre and unforeseen circumstances, chanced into the trap. Although probable cause apparently existed for the FBI to arrest him and to charge him, subsequent investigation revealed his total lack of guilt and all charges against him were dropped. The plaintiff sued the defendant newspaper for defamation, based upon a fourteen-paragraph article setting forth the arrest and charge of the plaintiff and a detailed account of the crime itself and the trap laid to ensnare the extortionist.

There, as here, the newspaper and its reporter did not know and had no desire to harm the defamed plaintiff. In that case, the reporter relied upon facts furnished him by an FBI Agent over the telephone. The reporter made no independent investigation to check out the facts of the crime or to determine the existence of probable cause for himself. He relied upon the representative of the FBI who, as a part of his official duties, received a call from the reporter and furnished the information in response to the reporter's inquiries. In holding that the defendant newspaper enjoyed a qualified or conditional privilege in relying upon an official version of events furnished to it by a representative of a law enforcement agency, we said at 22 Md.App. 581, 325 A.2d 140:

"Even if the underlying arrest or the underlying criminal charges turn out to be ill-founded, it is well settled that in

Maryland a newspaper enjoys a qualified privilege to publish reports of arrests and charges on which arrests are made, as well as other matters involving violation of the law. *Evening News Co. v. Bowie,* 154 Md. 604, 141 A. 416 (1928); *Piracci v. Hearst Corp.,* 263 F.Supp. 511 (D.Md. 1966) (construing Maryland law)."

The public has a vital and legitimate concern in the affairs of government and in the performance of governmental officials and agencies—executive, legislative, and judicial. The designation of certain public officials, on a full-time or on a part-time basis, as public relations or press affairs officers is no mere frill or extracurricular indulgence but a recognition of the important role played by effective communication between government and the public. We take significant notice of the fact that in this case we are not dealing with some unofficial version of events furnished by a policeman at a crime scene, with some unattributed "leak" or offhand prediction, with some characterization or interpretation of events by a prosecutor in a courtroom corridor, but rather with the authorized release of important information through an established and official channel.

The State Police, operating from their Leonardtown barracks, have the major burden for all law enforcement in St. Mary's County. Sergeant Dammann, as one of his official duties, was charged with the responsibility of preparing the weekly Press Release, reporting crimes and arrests in the Leonardtown area. His deposition recited in detail the routine he followed in performing this official duty. The Press Releases that he prepared were typed up and duplicated and regularly made available to representatives of all of the news media. Sergeant Dammann further recited that the underlying criminal investigation reports, which he reviewed in preparing his summary, were not available to the public, including the press. It was the policy of the State Police not to provide to reporters the criminal investigation reports from which the items contained in the Press Release were prepared. To the best of Sergeant Dammann's knowledge, moreover, the Maryland State Police Headquarters in

Pikesville would not release the information contained in the criminal investigation reports and would not allow inspection of those reports. Short of going out and conducting its own criminal investigation at the crime scene, the press had available to it nothing but the authorized Press Release.

The appellant's efforts to distinguish the situation in this case from *Koren v. Capital-Gazette Newspapers, Inc., supra,* are unpersuasive. In *Koren,* an arrest was made but of the wrong person and that arrestee-plaintiff was subsequently released. In the instant case, an arrest was made of the right person, but the official news release listed the wrong name in reporting that arrest. The defamation is the same whether one is actually but erroneously arrested or not arrested but erroneously described as having been arrested. The appellant seizes upon selective phrases and clauses from several of the authorities cited in *Koren* to construct a proposition that the qualified privilege is available for the nonmalicious republication of a defamation only if the underlying arrest of the defamed-plaintiff was actually made. The selected phrases and clauses have been taken out of context and simply do not support any such legal proposition.

The appellant cites *Piracci v. Hearst Corporation,* 263 F.Supp. 511, 514 (D.Md.1966), for the sentence, "[T]he publication of the fact that one has been arrested, and upon what accusation, is not actionable, *if true.*" (Emphasis added in appellant's brief). That sentence from *Piracci* was, in its turn, a quotation from the 1907 case of *Commercial Pub. Co. v. Smith,* 149 F. 704, 706 (6th Cir.), a case not remotely apposite to the one before us. There, the fact of arrest was true enough but the allegedly erroneous report that was the predicate for the defamation action was a detailed account of the plaintiff's complicity in the crime. The legal principle there enunciated in full context, from which the appellant has wrenched a few selective words, is that although the publication of the fact of arrest is not actionable, if true, the

newspaper is not privileged to make supplemental comment which assumes the guilt of the person arrested. The quotation was used, in the *Piracci* case, as support for the same broad proposition, which is also totally inapposite to the one at bar. The plaintiff there had actually been arrested, but subsequent investigation showed that he was not involved in the crime; he was subsequently released. In that context, it was the fact of arrest, accurately reported, that gave the defendant-newspaper the benefit of the qualified privilege. It was pointed out that the newspaper did not go beyond a reporting of the police action by way of commenting on the case or inferring the probable guilt of the person arrested.

The simple thrust of the *Piracci* opinion was that the defendant-newspaper enjoyed a qualified privilege to report the event (the arrest and the charge) just so long as the newspaper's report (not the underlying police report) was "a substantially accurate statement of the facts" and did not go beyond that statement so as to "comment upon or infer probable guilt of the person arrested." Judge Northrop stated this well-settled principle of law at 263 F.Supp. 514:

"Recovery is further foreclosed by the privilege a newspaper enjoys to publish reports of the arrest of persons and the charges upon which the arrests are based, as well as other matters involving violations of the law. This privilege remains intact so long as the publication is confined to a substantially accurate statement of the facts and does not comment upon or infer probable guilt of the person arrested."

For present purposes in terms of enjoying the qualified privilege, the report that must be "a substantially accurate statement of the facts" is not Sergeant Dammann's recapitulation of the arrest reports but rather the defendant-newspaper's report of Sergeant Dammann's recapitulation. The "Police Blotter" of August 26 fairly and accurately reported the Press Release of August 24; it did not go beyond a simple report by way of editorial comment or by way of

inferring the probable guilt of the person ostensibly arrested. The qualified privilege was, therefore, not defeated.

Every citation of authority by the appellant is similarly flawed. He seeks sustenance in *Brush-Moore Newspapers, Inc. v. Pollitt,* 220 Md. 132, 138, 151 A.2d 530, 533 (1959), "[I]t is clear that a newspaper publishing an account of the proceedings . . . is protected only to the extent that its account is fair and substantially correct"; and in *McBee v. Fulton,* 47 Md. 403, 426 (1878), "The reports, though they need not be *verbatim,* must be substantially correct. . . ." Out of context, those quotations do not make clear in what regard the reports and accounts must be "substantially correct." A reading of the cases in context, however, makes it absolutely clear that the newspaper, to enjoy the qualified privilege, must give a fair and substantially correct account of the official proceedings that were involved in those cases, not of the underlying events that were the subjects of those proceedings. For purposes of this case, the report carried in the appellee's newspaper account of August 26 must be a fair and substantially correct report of the Press Release issued by the State Police. It was.

Similarly, the appellant, in citing *Restatement (Second) of Torts,* § 611, takes from the black-letter summary of the section the following words, "The publication of defamatory matter concerning another in a report of an official action or proceeding . . . is privileged if the report is accurate and complete or a fair abridgement of the occurrence reported." From that, the appellant argues that the appellee is not entitled to the qualified privilege because the report of arrest was inaccurate. The reading of all of § 611 in total context, however, makes it indisputable that what must be accurately reported is the intermediate proceeding (or public record or press release, etc.) and not the ultimate factual incident referred to in that proceeding (or public record or press release, etc.).

The appellant places his heaviest reliance on *Yerkie v. Post-Newsweek Stations, Michigan, Inc.,* 470 F.Supp. 91, 94

(D.Md.1979), a case not remotely apposite. *Yerkie* involved a situation where a television news reporter made his own investigation and commented upon the manner and method by which a towing business was conducted. There was no official governmental action (accurately or inaccurately reported) even tangentially involved. In structuring his opinion, Judge Miller listed, for the sake of completeness, the various ways in which a qualified privilege is sometimes available to the media. In a paragraph, he mentioned the qualified privilege available when the media are reporting on official proceedings, public records, and meetings open to the public but then pointed out that that situation was not in any way before the court in that case, "In the instant case, there was never an arrest or judicial proceeding and the qualified privilege relating to the reports of such proceedings is not applicable."

In the present case, of course, there was an arrest; the official police version of the arrest simply confused the names of the victim and the arrestee. The situation is strikingly similar to that in *Mathis v. Philadelphia Newspapers, Inc.,* 455 F.Supp. 406 (E.D.Pa.1978). In that case, two brothers, John and Tyrone Mathis, were arrested for kidnapping and attempted bank robbery. The Philadelphia Police Department erroneously furnished to television stations and newspapers a photograph of the plaintiff, John Mathis, who was no relation to the arrested John Mathis and who had nothing to do with the crime. In ruling that the media were entitled to rely upon the information furnished by the police department and, therefore, enjoyed a qualified privilege, the court reasoned, at 455 F.Supp. 416:

> "The 'night command' is the designated source for official information regarding the activities of detectives within the Philadelphia Police Department. . . . Thus, the 'night command,' by releasing plaintiff's photograph to representatives of the news media, issued an informal report concerning the likeness of a criminal suspect. Defendants

PNI and Bulletin Company, by republishing those photographs and reprinting information supplied along with them, in effect republished a governmental report. The complained-of publications consequently fall with the section 611 privilege."

The opinion of the court went on, at 455 F.Supp. 417, to point out precisely what it is that must be accurate:

"The section 611 privilege is limited, however, to 'accurate' reports of an official action or proceeding, and I must therefore consider whether defendants published 'accurate' reports within the meaning of section 611. *See generally* Restatement (Second) of Torts § 611, Comment f (1977). In addressing that question, the complained-of-publications must be compared, not with the events that actually transpired, but with the governmental reports that defendants republished."

*See also Gawel v. Chicago American Publishing Co.,* 1 Ill. App.3d 481, 274 N.E.2d 628 (1971); *Sciandra v. Lynett,* 409 Pa. 595, 187 A.2d 586 (1962); *Moloney v. Tribune Publishing Co.,* 26 Wash.App. 357, 613 P.2d 1179, 1181–82 (1980).

The foundation on which the qualified privilege is based is legitimate reliance on an authorized governmental account of an official action. The precise nature of the error that may inhere in that governmental account is immaterial to the existence of the privilege. The present situation is, therefore, directly controlled by our conclusion in *Koren v. Capital-Gazette Newspapers, Inc.,* at 22 Md.App. 582, 325 A.2d 140:

"In reporting accurately what was told to its reporters by the FBI ... Capital was fully privileged. Even to begin to make a case, the Korens must establish some falsity emanating not from the FBI but from Capital directly."

The motion for summary judgment was correctly granted.

JUDGMENT AFFIRMED; COSTS TO BE PAID BY APPELLANT.